**UNITED STATES of America**

**v.**

**Chaka FATTAH, Sr., et al.**

**CRIMINAL ACTION NO. 15–346**

United States District Court,
E.D. Pennsylvania.

Signed 10/20/2016

340

Eric L. Gibson, Jonathan Ian Kravis, United States Department of Justice, Washington, DC, Paul L. Gray, Andrea Foulkes, Bea Witzleben, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Mark M. Lee, Samuel W. Silver, Bruce P. Merenstein, Schnader Harrison Segal & Lewis LLP, Kevin V. Mincey, Shabrei M. Parker, Thomas O. Fitzpatrick, Mincey & Fitzpatrick LLC, Riley H. Ross, III, Ross Legal Practice LLC, Catherine M. Recker, Amy B. Carver, Robert E. Welsh, Jr., Welsh & Recker, P.C., Barry Gross, Meredith C Slawe, Mira E. Baylson, Drinker Biddle & Reath LLP, Mariana Rossman, The Rossman Firm LLC, Dana Bazelon, Law Offices of Dana Bazelon, Ronald H. Levine, Matthew Todd Newcomer, Post & Shell, P.C., Ann Campbell Flannery, Philadelphia, PA, Henry W. Asbill, Jacob M. Roth, James M. Burnham, Julia Sheketoff, Noel John Francisco, Jones Day, Washington, DC, Peter Goldberger, Ardmore, PA, Steven R. Paisner, Paisner Litvin LLP, Bala Cynwyd, PA, for Defendants.

## MEMORANDUM

Bartle, District Judge.

This action is the story of political corruption involving five criminal schemes. Following their convictions by a jury after a lengthy trial, the defendants have filed motions for judgments of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or in the alternative for a new trial under Rule 33.

Congressman Chaka Fattah, Sr., Herbert Vederman, Robert Brand, Karen Nicholas, and Bonnie Bowser were charged in a twenty-nine count indictment with conspiracy to commit racketeering (18 U.S.C. § 1962(d)) as well as an array of other crimes.[1] The indictment, which was returned on July 29, 2015, also accused the defendants of one or more of the following offenses: conspiracy to commit wire fraud (18 U.S.C. §§ 1343 and 1349); conspiracy to commit honest services wire fraud (18 U.S.C. §§ 1343, 1346, and 1349); conspiracy to commit mail fraud (18 U.S.C. §§ 1341 and 1349); mail fraud (18 U.S.C. § 1341); falsification of records (18 U.S.C. §§ 1519 and 2); bribery conspiracy (18 U.S.C. § 371); bribery (18 U.S.C. § 201); bank fraud (18 U.S.C. §§ 1344 and 2); false statements to financial institutions (18 U.S.C. §§ 1014 and 2); money laundering (18 U.S.C. §§ 1957 and 2); money laundering conspiracy (18 U.S.C. § 1956(h)); and wire fraud (18 U.S.C. § 1343).

Fattah, at all times relevant, represented the Second Congressional District of Pennsylvania which currently encompasses parts of Philadelphia and Montgomery Counties. Prior to taking his seat in the United States House of Representatives in 1995, he served as a Representative and later as a Senator in the Pennsylvania General Assembly. Vederman, a former Deputy Mayor of Philadelphia and lobbyist, was close to Fattah and was a long-time Fattah supporter and contributor. Brand, whose wife was at one point a member of Fattah's congressional staff, was a Philadelphia businessman and also a long-time Fattah supporter. Nicholas was formerly employed as a member of Fattah's congressional staff and at the time of the events in question was the chief executive officer of Educational Advancement Alliance ("EAA"), a non-profit entity established by Fattah. Finally, Bowser held the position of chief of staff of Fattah's congressional office in Philadelphia for many years and served at times as the treasurer of the Fattah for Mayor campaign and the Fattah for Congress campaign. She had a close working relationship with Fattah and held a power of attorney for him personally.

---

1. Prior to trial, the court granted the motion of Nicholas to dismiss Count Twenty–Seven charging her alone with money laundering. See Doc. No. 224. Thus, only twenty-eight counts remained thereafter.

The jury returned a verdict of guilty against Fattah on all twenty-two counts in which he was named. Specifically, it found against him on Count One (conspiracy to commit racketeering), Count Two (conspiracy to commit wire fraud), Count Three (conspiracy to commit honest services wire fraud), Count Four (conspiracy to commit mail fraud), Counts Five through Ten (mail fraud), Counts Eleven through Fifteen (falsification of records), Count Sixteen (bribery conspiracy), Count Seventeen (bribery), Count Nineteen (bank fraud), Count Twenty (false statements to a financial institution), Count Twenty-One (falsification of records), Count Twenty-Two (money laundering), and Count Twenty-Three (money laundering conspiracy).[2]

Vederman was found guilty on all eight counts against him. They were Count One (conspiracy to commit racketeering), Count Sixteen (bribery conspiracy), Count Eighteen (bribery), Count Nineteen (bank fraud), Count Twenty (false statements to a financial institution), Count Twenty-One (falsification of records), Count Twenty-Two (money laundering), and Count Twenty-Three (money laundering conspiracy).

Brand was named in Count One (conspiracy to commit racketeering) and Count Two (conspiracy to commit wire fraud). The verdict was guilty on both counts.

As to Nicholas, the jury convicted her on Count One (conspiracy to commit racketeering), Count Two (conspiracy to commit wire fraud), Counts Twenty-Five and Twenty-Six (wire fraud), and Counts Twenty-Eight and Twenty-Nine (falsification of records) but acquitted her on Count Twenty-Four (wire fraud).

The jury found Bowser guilty on Count Sixteen (bribery conspiracy), Count Nineteen (bank fraud), Count Twenty (false statements to a financial institution),

Count Twenty-One (falsification of records), and Count Twenty-Two (money laundering). She was found not guilty on Count One (conspiracy to commit racketeering), Count Two (conspiracy to commit wire fraud), Count Three (conspiracy to commit honest services wire fraud), Count Four (conspiracy to commit mail fraud), Counts Five through Ten (mail fraud), Counts Eleven through Fifteen (falsification of records), and Count Twenty-Three (money laundering conspiracy).

■■■ The defendants, as noted above, have pending motions under Rules 29 and 33. Under Rule 29, the court must "enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The court must review the evidence in the light most favorable to the Government to determine whether a rational jury could have found a defendant guilty beyond a reasonable doubt. See United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001). All reasonable inferences, of course, are drawn in favor of the jury's verdict. A defendant carries a heavy burden when challenging the sufficiency of the evidence. See United States v. Lore, 430 F.3d 190, 205 (3d. Cir. 2005).

■■■ Pursuant to Rule 33, the court may grant a new trial "if the interest of justice so requires." The standard of review under Rule 33 is different than under Rule 29. Here, the evidence is not evaluated in the light most favorable to the Government. Instead, a new trial may be granted if in the view of the court the verdict is against the weight of the evidence. See United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002). The court must consider whether there is "a serious danger that a miscarriage of justice has occurred." See United States v. Silveus, 542 F.3d 993, 1004–05 (3d Cir. 2008).

**2.** Fattah resigned his seat in Congress on June 23, 2016, two days after the jury verdict.

## I.

The first criminal scheme charged in the indictment centered on a $1,000,000 illegal loan to the unsuccessful campaign of Fattah to become Mayor of Philadelphia in 2007. The evidence, taken in the light most favorable to the Government, established the following facts.

In the spring of 2007, Fattah, a member of Congress, was in need of funds for his faltering primary campaign for Mayor of Philadelphia. To remedy the situation, Fattah arranged for an illegal campaign loan of $1,000,000 from a wealthy donor. This sum far exceeded the amount allowed under the recently enacted City of Philadelphia ordinance which provided for a maximum individual campaign contribution of $2,500 for city-wide races for office. To conceal the loan, Fattah had the donor wire the $1,000,000 to LSG Strategies Services Corporation ("LSG"), the Washington, D.C. political consulting firm of Thomas Lindenfeld. At Fattah's direction, Lindenfeld signed a promissory note with the donor for the $1,000,000.[3] Fattah assured Lindenfeld that he, Fattah, would cover the debt.

Lindenfeld distributed some of the $1,000,000 to Gregory Naylor, a Lindenfeld friend and long-time Fattah confidant, who paid various Fattah campaign expenses through his political consulting firm Sidney Lei & Associates ("SLA").[4] Naylor had known Fattah for more than thirty years and had served for a period of time as the district director of Fattah's congressional office in Philadelphia. Naylor used $200,000 of this sum to pay "walking

around money" in cash to a large group of campaign workers on the eve of the primary election on May 15, 2007. To camouflage that this widely known expenditure came from an illegal loan, Naylor submitted a false SLA invoice dated June 1, 2007 to the Fattah mayoral campaign for approximately $193,000. The invoice stated it was for election-day campaign expenses, although SLA itself never incurred any. Naylor sent the invoice at the instruction of Fattah.

After Fattah's defeat, Lindenfeld mailed back to the donor a check for $400,000 which represented the portion of the $1,000,000 loan that was never spent. The donor, however, also pressed for the return of the remaining $600,000. Lindenfeld reported this development to Fattah who told Lindenfeld that he would take care of it. Fattah arranged for the non-profit EAA to provide the money to pay the debt. EAA, which Fattah had established, was headed by Nicholas, his former staffer. She proceeded to misappropriate a $500,000 charitable grant from Sallie Mae and a $100,000 grant from the National Aeronautics and Space Administration ("NASA") for this purpose. Both grants to EAA were intended to support the non-profit's educational work.

On January 24, 2008, Nicholas, using funds from Sallie Mae, transmitted a check for $500,000 from EAA to Solutions for Progress ("SFP"), a company in Philadelphia led by Brand. Several days later, Brand had $600,000 wired to Lindenfeld's firm. Lindenfeld then returned the money by wire to the donor the same day that he

---

3. Lindenfeld pleaded guilty in a separate action to one count of conspiracy to commit wire fraud. See United States v. Lindenfeld, No. 14–598, 2014 WL 12546956 (E.D. Pa. 2014). He provided substantial assistance to the Government in this case and testified at the trial.

4. Naylor pleaded guilty in a separate action to misprision of a felony, scheme to falsify, and false statements. See United States v. Naylor, No. 14–457 (E.D. Pa. 2014). He too provided substantial assistance to the Government in this case and testified at the trial.

received it. The wired funds were sent from SFP's bank account in Pennsylvania through Rhode Island, Virginia, and Washington, D.C. to LSG's bank account and then from LSG's bank account through Vederman to the donor's bank account. Nicholas later defrauded NASA of $100,000 and forwarded this sum to Brand in May 2008 to make him whole.

Nicholas and Brand attempted to disguise the purpose of the transfer of the $600,000 from EAA to SFP with a $600,000 sham contract for software to be provided by SFP to EAA. The contract, however, was not signed until August 2008, months after EAA had forwarded the $600,000 to SFP and only after a Department of Justice audit of EAA had begun and a subpoena had been served on SFP by the Office of the Inspector General of the Department of Justice. SFP never provided anything of value to EAA under their contract.

Brand and Lindenfeld likewise entered into a fake contract to cover up the real reason for the movement of the money from SFP to Lindenfeld's firm, LSG. Under the contract, LSG purportedly would provide SFP with services for $600,000. SFP paid LSG upfront the entire $600,000, but LSG never did anything of value for SFP in return. This subterfuge was concocted at the initiation of Brand. Throughout, Lindenfeld kept Fattah apprised about the transfer of money from Brand to the donor.

Steps were taken by the Fattah for Mayor campaign to address the June 1, 2007 invoice for $193,000 from SLA, Naylor's consulting firm. This invoice, as noted above, had been designed to conceal a portion of the illegal loan. As required by local law, this debt was included in the campaign's public filings. It was important for an elected official to pay off or write down his campaign debts in order to maintain his political standing. To wipe the debt from the campaign's books and to avoid the appearance that Fattah could not raise money and satisfy his obligations, the Fattah for Mayor campaign began to write down the $193,000 bogus obligation in $20,000 annual increments. This was the limit of annual debt forgiveness allowed under local election law. These annual write-downs of the debt, recorded in public filings with local election officials, continued through 2014 even though there was in fact no actual debt to retire. In filing the campaign finance reports, Fattah swore or affirmed on the face of each filing "that to the best of my knowledge and belief this political committee has not violated any provisions of the Act of June 3, 1937 (P.L. 1333, No. 320) as amended."

## II.

The Government has established the following facts as to the "Blue Guardians" scheme, which involved a promise by Fattah to obtain a federal appropriation for Lindenfeld in return for Lindenfeld's forgiveness of a campaign debt owed to his consulting firm.

After Fattah lost the primary election for Mayor of Philadelphia on May 15, 2007, he continued to serve in Congress. According to campaign filings, his mayoral campaign still owed Lindenfeld and LSG some $130,000 for their work on that failed effort. Lindenfeld met with Fattah in 2008 and pressed for payment. Fattah responded that his campaign did not have the funds to pay the debt. Fattah also explained that he needed to write down the obligation on his campaign finance reports. Because these reports are a matter of public record, ignoring the campaign debts or having a large unpaid balance affects the electoral strength of a candidate and makes it harder to raise funds for future campaigns. Since his campaign could not

pay what it owed LSG, Fattah promised to obtain a $15,000,000 federal appropriation for Lindenfeld's benefit in return for LSG's forgiveness of the debt. Fattah proposed that the appropriation be funneled through a nonprofit corporation called Blue Guardians to be created by Lindenfeld. The purpose of Blue Guardians would be to promote coastal environmental preservation along the southern Atlantic and Gulf coasts and the United States islands in the Caribbean Sea. Lindenfeld, a political consultant, had no experience or expertise in the environmental field.

In early 2010, Lindenfeld, following Fattah's instruction, created Blue Guardians as a nonprofit corporation. For political reasons, Fattah needed it to have a Philadelphia address. At Fattah's direction and with the concurrence of Brand, Lindenfeld used the South Broad Street address of Brand's company SFP in Philadelphia even though Lindenfeld was in Washington, D.C.

Lindenfeld took a number of additional steps to activate Blue Guardians. He sent via the internet an application for Blue Guardians for an Employer Identification Number from the Internal Revenue Service. The transmission went from Washington, D.C. to Cincinnati, Ohio. An LSG employee also sent an application on behalf of Blue Guardians for an identification number from the Data Universal Numbering System, which is required for all federal grant applications. The application was transmitted by the internet from Washington, D.C. to Berkeley Heights, New Jersey. In addition, Lindenfeld opened a bank account for Blue Guardians.

Lindenfeld and LSG, with the guidance of Fattah, submitted to the Appropriations Committee of the House of Representatives in 2009 a "FY 2010 Appropriations Project Questionnaire" seeking $15,000,000 for Blue Guardians. This was done even before Blue Guardians came into existence. In 2010, Lindenfeld on behalf of "Blue Guardians" submitted a completed questionnaire for a $3,000,000 appropriation for the fiscal year 2011. Fattah's staff helped formulate the answers on the questionnaires.

In the spring of 2010, an investigative reporter from The Philadelphia Inquirer got wind of Blue Guardians and asked Lindenfeld about it. Lindenfeld reported the inquiry to Fattah, and the project was abandoned. Blue Guardians never reached the operational stage.

In the meantime, beginning in 2010, as part of the bargain to eliminate the $130,000 debt owed by the Fattah for Mayor campaign to Lindenfeld, Fattah began to write down the debt in $20,000 increments in his annual campaign finance reports. This was the maximum yearly deduction allowed under local election law. These public filings continued through 2014 and in each instance Fattah certified them as not in violation of Pennsylvania law.

## III.

The third scheme described Fattah's use of campaign funds to pay the student debts of his son and the contemporaneous deception of campaign creditors. The facts are outlined in the light most favorable to the Government.

Fattah directed that funds from the Fattah for Mayor campaign and the Fattah for Congress campaign be diverted for the payment of some of the student debts that his son, Chaka Fattah, Jr., owed to Drexel University and to Sallie Mae. From January 2008 into November 2010, Fattah had Bowser, his Fattah for Mayor and Fattah for Congress treasurer, transmit to Naylor checks payable to SLA from the Fattah for Mayor campaign account. On occasion,

those funds had first been moved from the Fattah for Congress account to the Fattah for Mayor account. At Fattah's instruction, Naylor then used these funds to satisfy the student debts of Chaka Fattah, Jr. Naylor, through SLA, mailed thirty-five payments totaling in excess of $20,000 to Drexel University and Sallie Mae on behalf of Fattah's son from the summer of 2007 into the spring of 2011.

To conceal the use of Fattah for Mayor and Fattah for Congress funds to pay off the student debts of Fattah's son, Fattah made false filings with state and local election officials. The filings falsely documented the payments as expenditures to SLA against the June 1, 2007 bogus invoice that Naylor had sent to the Fattah for Mayor campaign for approximately $193,000. Naylor improperly provided Chaka Fattah, Jr. with copies of Internal Revenue Service 1099 forms to cover the money used to pay the latter's debt.

While Naylor was paying the obligations of Fattah's son with campaign funds, the Fattah for Mayor campaign owed the law firm of Montgomery McCracken Walker & Rhoads, LLP $84,667.35 for legal services it had rendered in connection with the 2007 mayoral campaign. In 2008, Vederman, a close and active financial supporter of Fattah and the Fattah for Mayor campaign, approached the firm to settle the debt. The firm agreed to do so by foregoing $40,000 over a two-year period. Vederman told the attorney of the firm with whom he met that it would be very difficult for Fattah to raise the funds needed to meet this entire obligation. The firm was never advised that Fattah for Mayor campaign funds were being used to pay Chaka Fattah, Jr.'s college debt. This information would have been material to the firm in deciding whether to compromise the campaign debt.

In 2009, the Fattah for Mayor campaign still owed $55,000 to a small printing company for campaign mailings it had created in 2007. Before the printing company performed the work in issue, Fattah had made personal contact with the owner and had signed a personal guarantee in early May 2007 to pay all the sums due. In 2010, Vederman met with the owner on behalf of Fattah and the Fattah for Mayor campaign about retiring the debt. Several subsequent meetings and other interactions occurred between the owner and Vederman. In December 2011, the owner finally settled the debt for a payment of $25,000. Again, no one ever told him that Fattah for Mayor campaign funds were being siphoned off to satisfy the college debt of Chaka Fattah, Jr. If he had known this, he never would have entered into the compromise.

There is no evidence that Vederman knew anything about the payment of Chaka Fattah, Jr.'s student debts by the Fattah for Mayor campaign.

IV.

The indictment also alleged a bribery scheme involving Fattah, Vederman, and Bowser. Accepting the evidence in the light most favorable to the Government, the record demonstrated that Fattah, as a Congressman, made a focused effort to secure an ambassadorship for Vederman from late 2008 through late 2010 and hired Vederman's girlfriend as a low-show employee on his staff in January 2012. In return, Vederman provided things of value to Fattah.

In November 2008, shortly after the election of Barack Obama, Fattah wrote the following letter on official letterhead to Senator Robert Casey of Pennsylvania in which he "strongly recommend[ed]" Vederman as an "unquestionably exceptional candidate" for an ambassadorship:

Dear Bob:

I am writing to strongly recommend Mr. Herb Vederman for an opportunity to represent our country through an ambassadorship.

Mr. Vederman is willing to serve in any location that would be helpful to the Obama Administration. His resume is attached, however I felt it important to highlight his experience as a member of the Mayor of Philadelphia's cabinet for 8 years and the Governor's cabinet, as well. Mr. Vederman has traveled extensively throughout Europe and Asia on diplomatic missions, government related trade delegations and for personal business. This direct contact and experience has provided him with the diplomatic knowledge and tools necessary on cultural, governmental and business customs. On governmental travel alone, Mr. Vederman visited nearly 20 different countries representing the Commonwealth of Pennsylvania's interests, and worked with foreign trade and business officials. In addition to this wealth of experience, Mr. Vederman serves as an adjunct professor of government. at Drexel University, an opportunity that came in recognition of his expertise in working with legislators and public policy formulators.

Mr. Vederman has devoted most of his career to public service. He has worked tirelessly to make a difference and is so committed that in each position, he has requested an annual salary of $1.00. He now offers his services to our president-elect for this same sum.

Mr. Vederman is an unquestionably exceptional candidate for an ambassadorship, particularly when considering the importance of diplomatic relations at this time. Based on my direct involvement both personally and professionally, he has proven himself to have both the initiative and the intellectual creativity necessary for this position. His communication skills are clear and concise, both essential elements as he ensures the interests of our nation while effectively representing our president.

I look forward to hearing from you or a member of your staff after you have had an opportunity to review his resume.

The letter was accompanied by a copy of Vederman's resume. A professor of international relations at American University also sent a letter of recommendation to Senator Casey. It turned out that the Senator was not prepared to recommend Vederman to be an ambassador and had no further contact with Fattah about the matter.

For several years before Fattah sent his letter to Senator Casey, Fattah and his wife had had an au pair from South Africa living with them. In August 2009, the au pair applied for a student visa to study at the Community College of Philadelphia. On the application, she had to provide information as to where she was staying and how she would finance her education while in the United States. She declared that the Fattahs would be her host family but that her financial sponsor would be Vederman.

In January 2010, Fattah signed a certification stating that he had the ability to satisfy the au pair's financial commitments when she sought a transfer to Philadelphia University. However, he did not submit the requested supporting bank statements or other documentation. Fattah explained that he did not provide the bank statements "for confidentiality reasons." Instead, he supplied a letter dated January 14, 2010 from Vederman's bank in New York "to back this pledge." Philadelphia University accepted this arrangement. Without Vederman's letter the au pair would not have been able to study at Phila-

delphia University or remain in the United States. When she did transfer, Vederman paid her tuition balance of $3,000.

In February 2010, the month Vederman paid the tuition for Fattah's au pair, Fattah obtained a teleconference with White House deputy chief of staff James Messina to press for the naming of Vederman to an ambassadorship. Fattah enlisted Edward Rendell, the former Governor of Pennsylvania and former Mayor of Philadelphia, to join him on the call as an additional advocate for Vederman. Messina did not usually agree to a telephone conference of this kind with a congressman about a political appointment. It only happened because Fattah had a relationship with Rahm Emanuel, the White House chief of staff, who told Messina to do so.

Shortly thereafter, in March 2010, a member of Fattah's staff sent a follow-up email to the White House concerning the appointment of Vederman. Attached was a copy of the letter Fattah had sent to Senator Casey, the biography of Vederman, and the letter of recommendation from the American University professor. A few weeks later, Fattah's staff sent yet another email to the White House on the same subject.

In April 2010, Fattah found himself in need of funds to pay his wage taxes in the amount of $2,381 owed to the City of Philadelphia. Again, Vederman came to the rescue. On April 9, 2010, Vederman wrote a check for $3,500 payable to Fattah's son, Chaka Fattah, Jr. On April 15, the date the wage taxes were due, Chaka Fattah, Jr. made cash deposits totaling $2,310 into his father's bank account, and Fattah wrote a check that day to the City of Philadelphia in payment of his tax bill. Without the deposits by his son, Fattah did not have sufficient funds in his account to cover the check.

Fattah continued to press hard for the ambassadorship for Vederman. He took the unusual step of hand-delivering to the President of the United States a letter on his official stationery dated October 30, 2010. Fattah urged the President to name Vederman as an ambassador. The letter read:

Mr. President:

Governor Rendell and I have written letters and made phone calls to recommend Mr. Herb Vederman for an opportunity to represent our country through an ambassadorship. I'm writing this note to follow-up on this matter.

Mr. Vederman is willing to serve in any location that would be helpful to the Obama Administration. His resume was submitted to your staff, however I feel it important to highlight his experience as a member of the Mayor of Philadelphia's cabinet for 8 years and the Governor's cabinet, as well. Mr. Vederman has traveled extensively throughout Europe and Asia on diplomatic missions, government related trade delegations and for personal business. This direct contact and experience has provided him with the diplomatic knowledge and tools necessary on cultural, governmental and business customs. On governmental travel alone, Mr. Vederman visited nearly 20 different countries representing the Commonwealth of Pennsylvania's interests, and worked with foreign trade and business officials. In addition to this wealth of experience, Mr. Vederman serves as an adjunct professor of government at Drexel University, an opportunity that came in recognition of his expertise in working with legislators and public policy formulators.

Mr. Vederman has devoted most of his career to public service. He has worked tirelessly to make a difference and is so committed that in each position, he has

requested an annual salary of $1.00. He now offers his services to your administration for this same sum.

Mr. Vederman is an unquestionably exceptional candidate for an ambassadorship. He has proven himself to have both the initiative and intellectual creativity necessary for this position.

Governor Rendell and I look forward to hearing from a member of your staff soon.

On the same day as Fattah dated his letter to the President, Vederman opened his wallet once more. He sent a check to Chaka Fattah, Jr. for $2,800.

Several weeks later, on November 18, 2010, Fattah's chief of staff in Washington sent another email to the White House concerning Vederman. The email stated:

Kristin,

I hope all is well.

Congressman Fattah was with the President a few weeks ago and gave him a note following up on Herb Vederman's interest in serving the nation. The note is attached.

This note is a follow-up to a few calls with Mr. Messina, Congressman Fattah and Governor Rendell. It is our hope that Mr. Vederman will have an opportunity to discuss this opportunity with Mr. Messina. If I can be of any assistance, please let me know.

Despite Fattah's persistent efforts, Vederman was never named as an ambassador.[5]

At the end of 2011, Vederman's girlfriend lost her long-time job as a law clerk to a federal magistrate judge in Florida. At the time of her termination, she only needed ten months of federal service for her pension to vest. Vederman contacted Fattah about hiring her on his congressional staff in Philadelphia. She herself spoke to Fattah on the phone on Christmas Day, and during that conversation he told her that it should not be a problem for her to work for him. On December 26, 2011, at Fattah's suggestion, she sent Bowser, chief of staff of Fattah's Philadelphia office, an email addressed to Fattah describing her situation. She included a resume, a letter of recommendation, and several writing samples.

In December 2011, while Vederman's girlfriend was seeking employment on Fattah's staff, Fattah again found himself in need of money, and he and his wife, Renee Chenault–Fattah, turned again to Vederman. The Fattahs had decided to purchase a vacation home in the Pocono region of Pennsylvania and were short of funds to be able to close on the property. It so happened that Chenault–Fattah owned a 1989 Porsche. On January 12, 2012, she offered by email to sell it to Vederman for $18,000. Several hours later, Vederman responded that he would "love to purchase" it.

On December 13, 2011, Bowser, at Fattah's request, had faxed the realty agreement for the Pocono home to Credit Union Mortgage Association ("CUMA"), the mortgage loan processing organization, and to the realtor. Bowser had a close working relationship with Fattah as the long-time chief of staff of his Philadelphia office and held a personal power of attorney for him. On January 13, 2012, the day after Vederman agreed to purchase the Porsche, Bowser emailed Vederman with instructions on how to wire the money to Fattah's Wright Patman Congressional

---

5. In June 2011, Fattah's staff arranged a short meeting between Vederman and Ronald Kirk, the United States Trade Representative, in the hope that Vederman might be named to an unpaid federal trade advisory committee. It turned out that Vederman was not particularly interested in such a position, and this short-lived digression was abandoned.

Federal Credit Union account. Vederman wired the money that same day.

After Vederman wired the $18,000 into Fattah's Wright Patman account, thus making it available to help fund the purchase of the vacation home, Victoria Souza, the mortgage loan processor for CUMA, informed Fattah that she needed documentation of the source of the money. Fattah then rapidly began to generate that documentation. He responded to Souza on January 17, 2012 that the funds had resulted from the sale of a car and that the "paper work is in process." On January 17, 2012, Souza emailed Fattah that CUMA needed the bill of sale signed by the seller and purchaser and documentation as to the source of the wired funds.

Later that day, Bowser emailed the unsigned bill of sale for the Porsche to Vederman to sign. At that time, he was in Florida. She also emailed Fattah the link to instructions on selling a car and asked him for the title number and odometer reading for the Porsche. The next day, January 18, 2012, Vederman returned to Bowser the bill of sale signed and undated. Thereafter, on the same day, Bowser obtained the signature of Chenault–Fattah on the bill of sale and signed the bill of sale herself as a witness even though she never saw Vederman affix his signature. The bill of sale was backdated to January 16, 2012, the day before CUMA had requested documentation about the car. The backdating occurred sometime after Vederman had signed and returned it to Bowser and before Fattah forwarded it to Souza. The record does not reveal who added the date.

On January 19, 2012, Bowser had the title with the signatures of Vederman and Chenault–Fattah notarized but without either signatory appearing before the notary. Fattah emailed the title and bill of sale to Souza that same day.

The jury had more than enough evidence to find that the sale of the Porsche was a sham. Vederman never picked up the car or took possession of it. Chenault–Fattah continued to hold herself out as the owner. The Porsche remained with the Fattahs at their home as before. In May 2012, Chenault–Fattah renewed the registration as owner of the Porsche with the Pennsylvania Department of Transportation. In June 2012, she had the car serviced at a Porsche dealership in Conshohocken, Pennsylvania for $1,575. She continued to pay the insurance on the car after the ostensible sale. In November 2012, in a recorded conversation with a representative of the insurance company, she stated: "We have the Porsche which we take off of insurance during the winter because we have it just in the garage." She never mentioned any sale and continued to insure the car into 2015.

On January 19, 2012, less than a week after Vederman wired the $18,000 to Fattah and the same day that Fattah emailed the false title and bill of sale to CUMA, Vederman's girlfriend received a letter from Bowser welcoming her as an employee in Fattah's Philadelphia office. Bowser knew she was "Herb's [Vederman's] lady." Vederman's girlfriend remained employed for only two months and during this period spent half of her time in Florida. Although she was under the supervision of Bowser when she was at Fattah's Philadelphia office, no one there seemed to know what she did. She testified that she spent what time she was in the office largely on a project to archive Fattah's plaques and awards with Temple University. Nonetheless, her contact with Temple consisted of only one brief phone call and two emails. Nothing ever came of this project. She left her job in Fattah's office in late March 2012 when she took a position with a congressman in Florida. Fattah's hiring of

Vederman's girlfriend had put Fattah over budget for his office staff and her departure was documented with a letter of termination citing budgetary considerations.

## V.

The final scheme charged in the indictment involved the defrauding of and false statements to the National Oceanic and Atmospheric Administration ("NOAA") by Nicholas, the chief executive officer of EAA. The facts are narrated in the light most favorable to the Government.

In December 2011, EAA, a nonprofit entity which Fattah had founded, was experiencing financial difficulties. Accordingly, Nicholas requested a special grant of $409,000 from NOAA for the annual Fattah-founded National Conference on Higher Education, previously denominated the "Fattah Conference on Higher Education." Regardless of the good works EAA and its annual conference may have accomplished, one of EAA's purposes was to advance the political standing of Fattah. Fattah had served as the conference's keynote speaker and at that event t-shirts and other momentos with Fattah's name imprinted on them were handed out.

In her December 2011 email, Nicholas advised NOAA that the annual conference was to be held from February 17, 2012 through February 19, 2012 at the Sheraton Hotel in Philadelphia although Nicholas had missed the deadline for any application for the 2012 to 2013 fiscal year. NOAA responded in mid-January that it agreed in principle to provide $50,000 for the conference.

In May 2012, Nicholas wired a formal application to NOAA for a grant of $50,000. The application stated that the funds would be used between January 1, 2012 and June 30, 2012 although she did not state the actual dates of the Conference on Higher Education. NOAA then sought the exact dates of the conference because by that time it was too late to provide funds for an event which had already taken place. Nicholas stated that the conference was to take place from October 19, 2012 through October 21, 2012 at Philadelphia's Sheraton. Thereafter, she emailed to NOAA the criteria for the student participants purportedly attending the October 2012 conference. Nicholas also certified her agreement to abide by the award conditions. Based on these representations, NOAA approved the grant for the purported October 2012 conference and sent the $50,000 to EAA.

In November 2013, Nicholas wired false documentation to NOAA that the funds had been used as intended for the October 2012 conference although no such conference ever took place. In January 2014, she submitted a final progress report describing the non-existent conference purportedly held in October 2012. In that report, she also falsely stated that Congressman Chaka Fattah had been the featured speaker.

Nicholas kept some of the $50,000 grant on herself and forwarded $20,000 to Naylor in March 2013 in partial payment of money EAA owed to Naylor's firm SLA for services it had performed more than a year before.

## VI.

Fattah, Brand, and Nicholas have moved for judgments of acquittal or in the alternative for a new trial on Count Two of the indictment which charged them with conspiracy to commit wire fraud under 18 U.S.C. §§ 1343 and 1349. Count Two averred that they, as well as Bowser[6] and others, agreed to execute a scheme to defraud EAA and NASA. The scheme aimed

---

6. Bowser was found not guilty on this charge.

to obtain money and property by fraud, and to use interstate wires in furtherance of the conspiracy in connection with an illegal $1,000,000 loan to the Fattah mayoral campaign and its repayment.

Section 1343 provides in relevant part:

Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate ... commerce any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned, not more than 20 years, or both.

See 18 U.S.C. § 1343.

Section 1349 reads:

Any person who attempts or conspires to commit any offense under this chapter ... shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

See 18 U.S.C. § 1349.

■ In support of his motion for judgment of acquittal, Brand argues that there was insufficient evidence that he participated in a conspiracy to defraud EAA and NASA, that he knew of the $1,000,000 illegal loan, or that he was aware of the campaign finance reports that contained the annual $20,000 write down of SLA's $193,000 phony invoice.

■ It is well established that a conspirator does not have to be aware of all aspects or details of the conspiracy. See United States v. Bailey, 840 F.3d 99, 2016 WL 6081354, at *3 (3d. Cir. Oct. 18, 2016). Moreover, "the very nature of the crime of conspiracy is such that it often may be established only by indirect and circum-stantial evidence." See United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005).

The evidence established that Nicholas, at Fattah's direction, provided Brand's company, SFP, with $600,000 of EAA's money without SFP ever performing any services to EAA. A bogus contract between SFP and EAA was not signed by Brand and Nicholas until many months thereafter and only then after Government investigators were zeroing in on EAA and SFP. As part of Fattah's plan, Brand also promptly wired $600,000 in interstate commerce to LSG, again without LSG ever doing any work for his company under their bogus contract. This money, as Brand knew, was then used to pay off the debt to the donor. The evidence is more than sufficient for the jury to have found him guilty of conspiracy to commit wire fraud.

■ Nicholas, like Brand, also asserts that there was insufficient evidence to convict her of wire fraud conspiracy. Her argument, like his, is totally without merit. As the chief executive officer of EAA, she misappropriated $600,000 received from Sallie Mae and NASA and transferred the money to Brand at Fattah's direction. She attempted to conceal the transfer as a legitimate payment on a contract with Brand's SFP. Again, no contract was signed until months after the transfer and then only when Government investigators were hot on her trail. We repeat that no work was ever done for EAA for the $600,000.

Fattah, Brand, and Nicholas further contend that no interstate wire was involved. They are incorrect. The parties stipulated at trial that a wire transfer of $600,000 was sent from SFP's bank account in Pennsylvania through Rhode Island and Virginia to LSG's bank account in Washington, D.C. It was further stipulated that LSG wired the money from Washing-

ton, D.C. through Virginia to the bank account of the donor to repay him for the illegal loan to the Fattah for Mayor campaign. These wires to repay the illegal loan all took place in early 2008. Brand was responsible for sending the wire from SFP to Lindenfeld at LSG, and Lindenfeld was responsible for sending the wire to the donor.

 The defendants also maintain that the proof with respect to Count Two fails because it is time barred. The applicable statute of limitations is five years. See 18 U.S.C. § 3282(a). Conspiracy to commit wire fraud is a continuing offense, and the limitation period does not begin to run until the completion of the last act overt that is part of the offense. See United States v. Amirnazmi, 645 F.3d 564, 592 (3d Cir. 2011); United States v. Jake, 281 F.3d 123, 129 n.6 (3d Cir. 2002). The indictment was filed on July 29, 2015. Thus, an overt act must have occurred on or after July 29, 2010 for the count to be timely. See United States v. Bornman, 559 F.3d 150, 153 (3d Cir. 2009).

The Supreme Court ruled in Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), that "the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." See id. at 397, 77 S.Ct. 963. An act of concealment brings the conspiracy within the statute of limitations when "done in furtherance of the main objectives of the conspiracy." See id. at 405, 77 S.Ct. 963. Concealment activities after the purpose of the conspiracy has been attained "for the purpose only of covering up after the crime" do not extend the time to file an indict-ment. See id. In compliance with Grunewald, this court instructed the jury:

The Government charges that the filing of Fattah for Mayor campaign finance reports on or after July 29, 2010 brings Count Two within the five-year period because the reports concealed the alleged scheme to defraud charged as the object of the conspiracy. However, in order to bring an alleged fraud within the five-year period, you must find that when the alleged conspiracy was formed, the defendants expressly agreed to conceal the alleged fraud, and that their acts on or after July 29, 2010 furthered that purpose.

It is not enough for the Government to offer circumstantial evidence permitting an inference of an agreement to conceal, and it is not enough for the Government to offer direct evidence that the defendants implicitly agreed to conceal. The Government must prove by direct evidence that the conspirators originally expressly agreed to conceal the conspiracy.

The indictment alleged and the Government proved that the central objective of the conspiracy was to maintain and enhance the stature of Fattah as a political figure. Integral to this objective was the need to demonstrate that he could meet his financial obligations to his vendors and retire his campaign debts. The record contains evidence that it was a sign of weakness for a candidate or holder of public office to be unable to raise funds or to eliminate campaign obligations. Fattah obtained the $1,000,000 loan from the donor to help finance his run for Mayor. When the primary campaign ended in defeat in May 2007, it was necessary to pay off or appear to pay off or reduce his debts to maintain Fattah's political strength.

In June 2007, long before the repayment of the $1,000,000 loan in January 2008,

Fattah had Naylor prepare a $193,000 invoice to the Fattah for Mayor campaign to conceal most of the $200,000 that Naylor had distributed as "walking around money" using a portion of the illegal loan funds. Naylor had handed out this money in cash to dozens of election workers on the eve of the May 15, 2007 primary. It was well known in the community that these payments had been made and clearly questions would be asked as to the source of the funds. Thus, those expenditures were described in the fake invoice and included in the public Fattah for Mayor campaign filings. These steps made it appear that SLA, not the donor, was the source of the money.

Fattah, Lindenfeld, and Naylor, all experienced political operatives, knew from the outset that this non-existent debt to SLA would then need to be written off for Fattah to avoid appearing financially vulnerable, which would politically undermine Fattah. They also knew from the outset, as experienced political operatives, that the law only permitted a maximum of $20,000 to be written off each year and thus that it would take almost ten years of annual campaign filings to erase the debt. The campaign filings through 2014 concealing the fraudulent nature of the invoice and a part of the illegal $1,000,000 loan were clearly a central aim of this conspiracy to maintain the position of Fattah, a Congressman, as a viable political figure. Consequently, Count Two is not barred by the statute of limitations because overt acts, that is campaign filings, occurred as part of the plan of the conspiracy within five years of the filing of the indictment on July 29, 2015.

The defendants next argue that Count Two improperly alleged two conspiracies, one involving Fattah, Bowser, Lindenfeld, and Naylor in obtaining and spending the $1,000,000 loan and the other involving Fattah, Lindenfeld, Brand, and Nicholas in misappropriating Sallie Mae and NASA funds to repay the loan. A duplicitous indictment violates a defendant's constitutional right to notice of charges against him or her and undermines the right to assert a double jeopardy defense in a subsequent action. See United States v. Moloney, 287 F.3d 236, 239 (2d Cir. 2002); United States v. Crisci, 273 F.3d 235, 238 (2d. Cir. 2001). Our Court of Appeals has cautioned against formalism in resolving issues of duplicity. It explained: "a single count of an indictment should not be found impermissibly duplicitous whenever it contains several allegations that could have been stated as separate offenses, but only when the failure to do so risks unfairness to the defendant." United States v. Root, 585 F.3d 145, 155 (3d Cir. 2009).

Here, the jury could and did reasonably find that there was one conspiracy involving the obtaining, repayment, and concealment of the illegal loan with the aim of maintaining and enhancing Fattah's political stature in the community. The SLA invoice and the public campaign filings were all part of this objective. Simply because Brand or Nicholas may not have known or been involved in all the details of the conspiracy is of no consequence. See Bailey, 840 F.3d 99, 2016 WL 6081354, at *3. The indictment gave all defendants proper notice of the conspiracy allegation, and they experienced no unfairness in the way Count Two was framed.

Finally, defendants contend a new trial is required on Count Two because they were unfairly prejudiced by the introduction of evidence on other counts where guilty verdicts must be reversed. This spillover argument is without merit as we explain in Section XVI of this Memorandum.

The evidence was overwhelming that Fattah, Brand, and Nicholas were guilty of

the timely charge of conspiracy to commit wire fraud. Their motions for judgments of acquittal or for a new trial on Count Two will be denied.

## VII.

Count Three charged Fattah and Bowser [7] with conspiracy to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 1349. Specifically, it alleged that the Blue Guardians scheme deprived the citizens of the Second Congressional District of Pennsylvania of their right to the honest services of Congressman Fattah through bribery and that in furtherance of the scheme interstate wires were used. Fattah seeks a judgment of acquittal or in the alternative a new trial on this count.

■ Section 1346 provides that "a scheme or artifice to defraud," as used in § 1343, the wire fraud statute, "includes a scheme or artifice to deprive another of the intangible right of honest services." See 18 U.S.C. § 1346. The Supreme Court held in Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), that "§ 1346 covers only bribery and kickback schemes." Id. at 367, 130 S.Ct. 2896. Under the bribery statute, 18 U.S.C. § 201, it is unlawful for a public official to accept anything of value in return for being influenced in the performance of an official act. A promise to perform an official act is sufficient to constitute a bribery offense if done in exchange for a thing of value, whether or not the official act ever occurs. See McDonnell v. United States, —— U.S. ——, 136 S.Ct. 2355, 2371, 195 L.Ed.2d 639 (2016). The Supreme Court in McDonnell reiterated: "Under this Court's precedents, a public official is not required to actually make a decision or

take an action on a 'question, matter, cause, suit, proceeding or controversy'; it is enough that the official agreed to do so." Id. An act to be official "must involve a formal exercise of governmental power" and be something specific and focused. See id. at 2372; United States v. Birdsall, 233 U.S. 223, 234, 34 S.Ct. 512, 58 L.Ed. 930 (1914).

■ Fattah argues that any promise to obtain an appropriation was not an official act as a matter of law. This argument is without merit. The evidence proved overwhelmingly that Fattah promised Lindenfeld a federal appropriation for Blue Guardians, a corporation to be set up by Lindenfeld, in return for Lindenfeld's forgiveness of the $130,000 debt that the Fattah for Mayor campaign owed him and his consulting firm. The conspiracy continued into 2014 while Fattah was writing down the debt in his annual campaign filings.

It is hard to imagine a more quintessential official act than that which occurred here. Fattah, as a member of the House Appropriations Committee, agreed to obtain an appropriation for Lindenfeld's benefit. He promised a formal exercise of specific and focused governmental power. See McDonnell, 136 S.Ct. at 2371.

The facts here are quite similar to those charged in United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972). There the Supreme Court upheld the indictment of a former United States Senator for bribery under § 201. It charged him with accepting money while in office in return for promising to be influenced with respect to postage rate legislation pending in Congress. The Court stated:

The illegal conduct is taking or agreeing to take money for a promise to act in a certain way. There is no need for the

---

7. Bowser was found not guilty on this count.

Government to show that appellee [the Senator] fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise.

. . . .

Nor does it matter if the Member defaults on his illegal bargain. . . . If, for example, there were undisputed evidence that a Member took a bribe in exchange for an agreement to vote for a given bill and if there were also undisputed evidence that he, in fact, voted against the bill, can it be thought that this alters the nature of the bribery or removes it from the area of wrongdoing the Congress sought to make a crime?

See id. at 526–27.

Fattah also argues that the Government failed to prove beyond a reasonable doubt that the conspiracy involved any wires across state lines. This is incorrect. The Government established that Lindenfeld did indeed use the internet across state lines in organizing and readying Blue Guardians to do business. Specifically, he sent an email to obtain an IRS identification number. The wire was transmitted from Washington, D.C. to Cincinnati, Ohio. He also sought a special identification number for federal grant applications by sending a wire from Washington, D.C. to Berkeley Heights, New Jersey.

Consistent with McDonnell, this court instructed the jury that one of the elements of honest services wire fraud to be proven for a conviction was a "scheme to exchange an agreement to forgive a Fattah for Mayor campaign debt owed to Thomas Lindenfeld for a promise to secure an earmark for a nonprofit entity called Blue Guardians." The court directed the jury to the specific conduct of Fattah in issue and the thing of value alleged to be provided

by Lindenfeld. See United States v. Kemp, 500 F.3d 257, 281 (3d Cir. 2007). As more fully outlined in Section X of this Memorandum, the narrowing of the definition of official act in McDonnell does not require a new trial on Count Three since the only official act involved in the Blue Guardians scheme squarely meets that narrowed definition. Charging the jury in strict compliance with McDonnell would have made absolutely no difference in the outcome of the jury's verdict on this Count. Any error was harmless. See Fed. R. Crim. P. 52(a).

The motion of Fattah for judgment of acquittal or a new trial on Count Three will be denied.

## VIII.

The jury found Fattah guilty of conspiracy to commit mail fraud under 18 U.S.C. §§ 1341 and 1349 in Count Four of the indictment and of mail fraud under § 1341 in Counts Five through Ten, all in connection with Fattah's causing the use of Fattah for Mayor and Fattah for Congress campaign funds to pay the student debts of his son, Chaka Fattah, Jr.[8] He seeks judgments of acquittal or a new trial on these counts.

Section 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purposes of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing . . .

---

**8.** Bowser was found not guilty on these counts.

shall be fined under this title or imprisoned not more than 20 years, or both. See 18 U.S.C. § 1341.

■ The evidence is overwhelming that Fattah orchestrated the use of these campaign funds to pay his son's college debts. He directed Bowser, his campaign treasurer, to send the campaign funds to Naylor, and he had Naylor pay the debts through Naylor's consulting firm's bank account. The transmissions to SLA were disguised as payments due for work on the Fattah for Mayor campaign. The scheme involved at the very least fraud on the Fattah for Mayor campaign and the Fattah for Congress campaign. Two of the Fattah for Mayor campaign creditors—one a Philadelphia law firm and the other a small printing company—were also misled by omission. The creditors agreed to compromise their debts without being told that campaign funds were being used to help Chaka Fattah, Jr. Both creditors considered the omission to be material.

Counts Five, Six, Seven, Nine, and Ten charged Fattah with mail fraud with respect to the following checks mailed at Fattah's instigation by Naylor from SLA's bank account to Sallie Mae to pay off Chaka Fattah, Jr.'s student debt:

| Count | Mailing | Date |
|-------|---------|------|
| Five | Check to Sallie Mae for $1,051.03 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | September 20, 2010 |
| Six | Check to Sallie Mae for $525.52 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | November 8, 2010 |
| Seven | Check to Sallie Mae for $525.52 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | November 18, 2010 |
| Nine | Check to Sallie Mae for $525.52 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | December 17, 2010 |
| Ten | Check to Sallie Mae for $2,102.08 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | April 6, 2011 |

Fattah contends that the statements made to the campaign creditors charged in Counts Four through Ten to induce them to compromise the amount owed by the Fattah for Mayor campaign were not false or fraudulent. Even if he is correct, these

counts, as noted previously, specifically charged as part of the scheme that Fattah defrauded the Fattah for Mayor campaign and the Fattah for Congress campaign by directing Naylor to use these funds to pay the student debts of Fattah's son. Naylor in turn paid Sallie Mae and Drexel University by sending checks through the mail. Fattah does not challenge the sufficiency of the evidence that he directed Bowser to mail these campaign funds to Naylor and that Naylor mailed checks backed by those funds to Sallie Mae and Drexel as part of a conspiracy in which he was involved with Fattah. That evidence more than suffices for convictions for mail fraud and for conspiracy to commit mail fraud.

Fattah further asserts that he is entitled to a new trial on these counts because there was a prejudicial spillover effect from the evidence on other counts where the convictions must be reversed. As explained in Section XVI of this Memorandum, we reject this argument on prejudicial spillover.

Fattah does contend that the Government has not proven all the elements required in Count Eight. He maintains that the Government has not established beyond a reasonable doubt that Bowser mailed the check in issue to Naylor. The Count Eight check, unlike the others which are the subject of Counts Five, Six, Seven, Nine, and Ten, was drawn on the bank account of the Fattah for Mayor campaign. Naylor was the recipient, not the sender. The check was signed by Bowser, payable to SLA in the amount of $5,000, and dated November 22, 2010.

█ The use of the mails in furtherance of the scheme to defraud is an essential element of the offense under § 1341. See United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994). Naylor received five Fattah for Mayor campaign checks which were involved in the scheme, including the one charged in Count Eight. The others, which were outside the statute of limitations, were not charged in the indictment. Naylor testified that Bowser usually called him to let him know the check was coming. Naylor recalled that he "received most of them by mail, one or two may have been dropped off at the office." He further stated that he was "not exactly sure as to which ones [of the checks received from Bowser] were mailed and which ones [he] picked up personally."

█ We start with the principle, stated in Hannigan and cited by the Government, that "[i]t is well-established that evidence of business practice or office custom supports a finding of the mailing element of § 1341." See Hannigan, 27 F.3d at 892. Naylor, however, did not testify about the business practice or office custom of the sender, that is Bowser, the treasurer of the Fattah for Mayor campaign. Indeed, he would have been in no position to do so. All he could possibly know is how he received the five checks from Bowser. While he remembered that most were received by mail, he also testified that one or two may have been hand-delivered or picked up. We need not delve into the propriety of statistics or probabilities in proving an element of a criminal offense, particularly where the sample was so small. In our view, Naylor's testimony that there was a 60% to 80% probability that the November 22, 2010 check was mailed to him is not enough to find Fattah guilty of mail fraud on Count Eight beyond a reasonable doubt.

Accordingly, we will deny the motion of Fattah for judgments of acquittal or new trial on Counts Four, Five, Six, Seven, Nine, and Ten and will grant his motion

for judgment of acquittal on Count Eight.[9]

## IX.

The jury returned a verdict of guilty against Fattah on Counts Eleven through Fifteen charging him with falsification of records under 18 U.S.C. §§ 1519 and 2.[10] He seeks judgments of acquittal or a new trial on these counts.[11]

Section 1519 provides:

Whoever knowingly . . . conceals . . . falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

See 18 U.S.C. § 1519.

Counts Eleven through Fourteen alleged, in essence, that the Fattah for Mayor Committee falsified the Pennsylvania campaign finance report filings for each of the years 2010, 2011, 2012, and 2013 with the intent to impede investigations by the Department of Justice and the Federal Bureau of Investigation. Each report was signed by Fattah under oath that he had not violated the Pennsylvania election law.

Count Fifteen alleged a false "FEC FORM 3" styled "Report of Receipts and Disbursements" filed with the Federal Election Commission in December 2010, by Bowser, the treasurer of the Fattah for Congress Committee, again with the intent to impede a federal investigation. That form stated that the Fattah for Congress Committee disbursed $5,000 to the Fattah for Mayor Committee on November 19, 2010. These funds were not used for legitimate expenditures of the Fattah for Mayor campaign but to satisfy some of the personal financial obligations of Chaka Fattah, Jr.

Although Fattah states that the jury lacked sufficient evidence to convict him on all counts, he offers no specific supporting argument with respect to Counts Eleven through Fifteen. Instead, he argues that he is entitled to a new trial on these counts because he suffered from prejudicial spillover of evidence introduced on other counts where the verdict must be overturned. We reject this prejudicial spillover argument for the reasons stated in Section XVI of this Memorandum.

The motion of Fattah for judgments of acquittal or for a new trial on Counts Eleven through Fifteen will be denied.

## X.

The jury found Fattah, Vederman, and Bowser guilty of bribery conspiracy on Count Sixteen. Fattah was also convicted of bribery on Count Seventeen and Vederman on Count Eighteen. The defendants now seek judgments of acquittal or, alternatively, a new trial on these counts in light of the Supreme Court's recent deci-

9. Pursuant to Rule 29(d) of the Federal Rules of Criminal Procedure, we find no new trial is warranted on Count Eight to the extent that the Court of Appeals disagrees with our decision to grant the judgment of acquittal.

10. Section 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsel, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

See 18 U.S.C. § 2.

11. The jury found Bowser not guilty on all of these counts.

sion in <u>McDonnell v. United States</u>, —— U.S. ——, 136 S.Ct. 2355, 195 L.Ed.2d 639 (2016). <u>McDonnell</u> was decided on June 27, 2016, six days after the jury reached its verdict in this case.

Count Sixteen charged Fattah, Vederman, and Bowser with conspiracy, in violation of 18 U.S.C. § 371, to commit bribery of a public official in violation of 18 U.S.C. § 201(b)(1)–(2) and to defraud the United States of the honest services of Fattah in violation of 18 U.S.C. §§ 1343 and 1346.

In Count Seventeen, Fattah was accused of bribery in accepting things of value from Vederman in exchange for being influenced in the performance of official acts as a public official. Section 201(b)(2) makes it unlawful for a public official to:

> directly or indirectly, corruptly demand[ ], seek[ ], receive[ ], accept[ ], or agree[ ] to receive or accept anything of value personally or for any other person or entity, in return for:
>
> (A) being influenced in the performance of any official act.

<u>See</u> 18 U.S.C. § 201(b)(2).

Count Eighteen charged Vederman with bribery of Fattah by supplying or promising to provide him things of value in order "to influence any official act" in violation of § 201(b)(1). Section 201(b)(1) makes it unlawful for an individual to:

> directly or indirectly, corruptly give[ ], offer[ ] or promise[ ] anything of value to any public official or person who has been selected to be a public official, or offer[ ] or promise[ ] any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—
>
> (A) to influence any official act.

<u>See</u> 18 U.S.C. § 201(b)(1).

Section 201 defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." <u>See</u> § 201(a)(3).

Our instruction to the jury on the meaning of official act mirrored the statutory language quoted above. We further explained that "it is not necessary for the Government to prove that a defendant intended to induce a public official to perform a number of official acts in return for things of value so long as the evidence shows a course of conduct of giving things of value to a public official in exchange for a pattern of official acts favorable to the giver."

Counsel for the defendants objected to this instruction on the meaning of official act and requested that the court model the instructions after the defendants' proposed jury instruction.[12] Counsel for defendants referenced the <u>McDonnell</u> case awaiting decision in the Supreme Court although no

---

**12.** In addition to requesting an instruction on the statutory definition of "official act," the defendants' proposed jury instruction stated:

The term "official act" includes the decisions or actions generally expected of the public official. The term "official act" does not include every action taken in one's official capacity. For example, not every act an official performs as a matter of custom or courtesy constitutes an "official act." An act done out of friendship, or for political reasons, may or may not be an "official act." An official can perform an official act by exercising influence over a government decision, when it is a settled practice as part of the official's position for him to do so. The defendants cited the Third Circuit Model Criminal Jury Instructions and <u>United States v. McDonnell</u>, 792 F.3d 478, 506 (4th Cir. 2015), cert. granted, —— U.S. ——, 136 S.Ct. 891, 193 L.Ed.2d 784 (2016), as the sources of this proposed instruction.

one, of course, knew at that time what or how the Court might rule.

In McDonnell, the former Virginia Governor Robert McDonnell was convicted of honest services fraud, in violation of 18 U.S.C. §§ 1343 and 1349, and of Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a), for accepting loans, gifts, and other bribes from Star Scientific chief executive officer Jonnie Williams in exchange for official acts relating to Star Scientific's nutritional supplement, Anatabloc. See McDonnell, 136 S.Ct. at 2366–67. The official acts alleged at trial were: (1) arranging meetings for Williams with Virginia officials to discuss Star Scientific's product; (2) hosting and attending events for Star Scientific at the Governor's mansion to encourage researchers to study Anatabloc; (3) contacting other government officials concerning studies of Anatabloc; (4) promoting Star Scientific's products and facilitating its relationships with government officials; and (5) recommending that senior government officials meet with Star Scientific executives. See id. at 2365–66.

In instructing the jury, the District Court described these five official acts and then quoted the statutory definition of official act. It also explained to the jury that "the term encompassed 'acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.' " See id.

Applying the harmless error standard, the Supreme Court vacated Governor McDonnell's convictions and remanded for further proceedings "[b]ecause the jury was not correctly instructed on the meaning of 'official act' " and "may have convicted Governor McDonnell for conduct that is not unlawful." See id. at 2375 (citing Neder v. United States, 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).

McDonnell ruled that the District Court must do more than quote to the jury the statutory definition of official act. First, the jury must identify a "question, matter, cause, suit, proceeding or controversy" that "involve[s] a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." See id. at 2372, 2374. Merely setting up a meeting, hosting an event, or contacting, calling, or speaking with another public official, without more, does not qualify as an official act. See id. at 2372. However, setting up a meeting, hosting an event, or making a phone call can serve as evidence of an agreement to take an official act. See id. at 2371.

Second, the jury must be told that to be an official act "the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official,' such as the question whether to initiate the research studies." See id. at 2374.

Third, the jury, to convict, must find that the public official "made a decision or took an action" on the "question, matter, cause, suit, proceeding or controversy." See id. The Supreme Court explained that a public official's mere expression of support to another public official for an action to be taken by that other public official is not an official act. Nonetheless, the jury may find that the public official undertook an official act if the official "us[es] his official position to exert pressure on another official to perform an 'official act' or if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official' act by another official." See id. at 2372. Thus, the Court drew a line between support expressed to anoth-

er official and pressure on or advice to that other official.

Fattah, Vederman, and Bowser, as noted above, were convicted of conspiracy to commit bribery in Count Sixteen, while Fattah and Vederman were also convicted of bribery in Counts Seventeen and Eighteen, respectively. The Government proved at the trial that Fattah used his position as a public official to pursue two objectives on Vederman's behalf in exchange for a "stream of benefits" from him. See Kemp, 500 F.3d at 282.

■ The evidence here established overwhelmingly that Fattah was engaged in official acts as defined in McDonnell in his persistent quest for an ambassadorship for Vederman. The appointment of an ambassador is a specific and focused exercise of governmental power. Fattah's aim was to obtain a high government post for a particular person, that is Vederman. It is hard to be more specific and focused than this.

Furthermore, unlike much of Governor McDonnell's activity, Fattah clearly crossed the line beyond mere expression of support for Vederman for an ambassadorship. He did not simply sign routine or pro forma letters of support to Senator Casey and to President Obama and then let the matter rest. Fattah first wrote to Senator Casey that he "strongly recommend[ed]" Vederman and attached a resume of Vederman. Through his contacts with Rahm Emanuel, he then set up a difficult-to-obtain telephone conference for himself and Governor Rendell to press Vederman's case with James Messina, the President's deputy chief of staff.

Fattah thereafter escalated matters to the highest level. He took the extraordinary step of hand-delivering a glowing letter of recommendation for Vederman to the President of the United States. In that letter, Fattah detailed Vederman's exten-sive array of qualifications to be an ambassador. He described Vederman to the President as someone who "has worked tirelessly to make a difference" and as "an unquestionably exceptional candidate [who] . . . has proven himself to have both initiative and intellectual creativity necessary for the position." Even after Fattah delivered this letter, his office followed up with emails to the White House.

Fattah, a long-time member of the House of Representatives and its powerful Appropriation Committee, was without question exerting pressure on and if not pressure certainly seeking to providing advice to the President and Senator Casey with the intent that they would act on that advice. See McDonnell, 136 S.Ct. at 2371. Fattah was not merely expressing support for Vederman's appointment and then letting the matter rest.

Fattah makes the meritless argument that he did not engage in official acts because as a Congressman he had no role in the naming of ambassadors. We recognize that under the Constitution it is the President who nominates and who with the advice and consent of the Senate appoints ambassadors. See U.S. Const. art. II, § 2. The fact that the House of Representatives has no constitutional responsibility in this regard does not immunize Fattah when he accepts a thing of value to pressure or advise the President or a Senator who both have that responsibility when it is Fattah's intent that the advice will form the basis of an official act. See McDonnell, 136 S.Ct. at 2371. This is exactly what happened here.

In addition to the matter of an ambassadorship for Vederman, the Government presented overwhelming evidence that Fattah's hiring of Vederman's girlfriend was an official act. Fattah's decision to employ her was clearly a formal and fo-

cused exercise of governmental power in that he spent the taxpayers' money to employ a specific person in his congressional office, albeit for a make-work job. Fattah told her in December 2011 that hiring her would not be a problem. She actually began her job on his staff in mid-January 2012. In contrast to his official acts to secure Vederman an ambassadorship by pressuring or advising the President and Senator Casey, Fattah's official act in hiring Vederman's girlfriend solely involved his own exercise of governmental power. These facts squarely fit the definition of an official act under McDonnell and other Supreme Court decisions.[13] See id. at 2371–72; see also Brewster, 408 U.S. at 526–27, 92 S.Ct. 2531.

To convict on a bribery charge, the jury of course must find more than the existence of an official act. It must also find that there was a thing of value in exchange for the official act. In other words, there must be a quid pro quo. McDonnell it must be emphasized did not change existing law with respect to this offense element and did not discuss it except in passing.

 The evidence before the jury was overwhelming concerning the things of value or stream of benefits which Vederman showered on Fattah for Fattah's official acts in pursuing the ambassadorship for Vederman and in the hiring of Vederman's girlfriend. As earlier explained in greater detail, Vederman provided financial guarantees and tuition for Fattah's au pair in 2009 and early 2010, paid Fattah's Philadelphia wage taxes in April 2010, and wrote a check to Fattah's son in October 2010. Every time that Vederman provided a benefit to Fattah or on Fattah's behalf, Fattah engaged in some official action to obtain an ambassadorship for Vederman. Indeed, on the very day Vederman wrote the October 2010 check to Chaka Fattah, Jr., Fattah penned his strong letter of recommendation to the President of the United States.

On January 13, 2012, Vederman deposited $18,000 into Fattah's Wright Patman Credit Union account to enable the Fattahs to have sufficient funds to buy a vacation home. The $18,000 came as a continuation of the stream of benefits from the largess of Vederman. A short time before, on Christmas day 2011, Fattah had told Vederman's girlfriend that it would not be a problem to hire her, and six days after he received the $18,000 she began her low-show job on his staff. The evidence, as shown above, was overwhelming that Vederman's purported purchase of Chenault–Fattah's Porsche in consideration of the $18,000 payment was a sham.

In sum, there was compelling evidence that Fattah and Vederman were guilty of bribery as charged in Counts Seventeen and Eighteen, respectively.[14] It follows that they were also guilty with respect to Count Sixteen which charged them under

13. We note that counsel for Governor McDonnell, who was also Vederman's counsel for his post-trial motion, argued to the Supreme Court that in contrast to the actions of the Governor, the hiring of a government employee would be an official act. See McDonnell, 136 S.Ct. at 2367.

14. There was also evidence that, in June 2011, Fattah arranged a meeting between Vederman and United States Trade Representative Ronald Kirk so that Vederman could attempt to secure an unpaid position on an advisory trade committee. Vederman, it turned out, had no interest in the position and any effort by Fattah in this regard was thus abandoned. Kirk's testimony during this lengthy trial lasted a mere sixteen minutes. Although the Government referred to this meeting in its opening statement, it made no reference to it in its summation to the jury. The episode was de minimis and in our view played no role in the outcome.

364

18 U.S.C. § 371 with conspiracy to commit bribery in violation of § 201(b).

██ Bowser for her part asserts that there was insufficient evidence to convict her of bribery conspiracy in Count Sixteen, regardless of what the evidence may be against Fattah and Vederman.

Bowser, as previously noted, was Fattah's long-time chief of staff in his Philadelphia congressional office. They had a close working relationship such that he had given her his personal power of attorney. In December 2011, Bowser was aware that Fattah and his wife were in the process of purchasing a home in the Poconos. On December 26, 2011, Vederman's girlfriend sent an email to Bowser seeking a position in Fattah's Philadelphia congressional office. Bowser forwarded the email to Fattah. In mid-January, Bowser welcomed Vederman's girlfriend to her low-work and low-show job. She described Vederman's girlfriend as "Herb's lady."

Bowser knew that the Fattahs were purchasing a vacation home at the same time that Fattah was hiring Vederman's girlfriend for a bogus job and that she would be her supervisor. Bowser also knew that at that very same time Fattah was accepting money from Vederman. Indeed, she sent Vederman instructions as to where and how he should wire the money into Fattah's Wright Patman Credit Union account. CUMA then sought documentation as to the source of the money. It was only then that documentation of the sham sale of the Porsche came into being. Bowser emailed to Fattah instructions on selling a car and helped procure the documentation. At Fattah's direction, she secured the signatures of Vederman and Chenault–Fattah on a bill of sale for the Porsche and proceeded to cut corners with respect to the transaction. She signed the bill of sale herself as a witness even though she never saw Vederman execute it. She obtained notarization on the title even though she knew that the signatories, Chenault–Fattah and Vederman, would not be present before the notary.

██ Bowser maintains that the Government has not proven her intent to join the bribery conspiracy. We are not persuaded. Intent most often can only be established by circumstantial evidence. See, e.g., United States v. Carr, 25 F.3d 1194, 1201 (3d. Cir. 1994). It also goes without saying that a conspirator need not know all the details of or participate in all aspects of the conspiracy to be found guilty. See United States v. Bailey, 840 F.3d 99, 2016 WL 6081354, at *3 (3d. Cir. Oct. 18, 2016). A jury could reasonably and without difficulty infer that Bowser, a confidant of Fattah, was so deeply involved and worked so closely with him and Vederman that she knew the nature of the bribery conspiracy and agreed to participate in it. See United States v. Boria, 592 F.3d 476, 481 (3d Cir. 2010).

Fattah, Vederman, and Bowser offer another reason in support of their motions for judgments of acquittal on Counts Sixteen, Seventeen, and Eighteen. They assert that the sale of the Porsche was not a sham because ownership passed to Vederman under Pennsylvania law when the title was signed by Chenault–Fattah as seller and Vederman as buyer.

They cite to Cicconi Auto Body v. Nationwide Ins. Co., 904 A.2d 933 (Pa. Super. Ct. 2006). That case is inapposite. There, it was undisputed that Nationwide Insurance Company had acquired a properly executed title for the vehicle from its insured. Nationwide argued among other points that it was not the owner of the vehicle because the vehicle was not delivered into its possession. Notably, the vehicle was not in the possession of the insured, was located in a body shop following a collision, was

not drivable, and was available to be picked up by Nationwide. The court quoted in part the Pennsylvania statute on motor vehicle title transfer, which reads:

(a) Duty of transferor.—In the event of the sale or transfer of the ownership of a vehicle within this Commonwealth, the owner shall execute an assignment and warranty of title to the transferee in the space provided on the certificate ... and deliver the certificate to the transferee at the time of the delivery of the vehicle.

See 75 Pa. Cons. Stat. § 1111(a).

While Cicconi contained a statement that a titleholder is an owner of the vehicle, the question presented in our case was: Who was the titleholder? The Government maintained that Vederman never acquired a properly executed title. Section 1111(a) also requires the owner to "execute an assignment and warranty of title to the transferee ... sworn to before a notary public or other officer empowered to administer oaths." See id. (emphasis added). Chenault–Fattah, it is undisputed, never appeared before the notary. Moreover, unlike the situation in Cicconi, there was evidence that Chenault–Fattah not only continued to possess the Porsche but also held herself out as the owner. Finally, Vederman never took delivery or registered the Porsche with the Pennsylvania Department of Transportation. See 75 Pa. Cons. Stat. § 1305.

The defendants also cite Department of Transportation v. Walker, 136 Pa.Cmwlth. 704, 584 A.2d 1080 (1990). This decision of the Commonwealth Court is not helpful to them. In that case, a husband had executed and delivered to his estranged wife all necessary documentation to transfer title of a motor vehicle to her. The wife, however, had not forwarded the documentation to the Department of Transportation or applied for a new title. The trial court found, based on the evidence, that she was the owner. In affirming, the Commonwealth Court emphasized that whether title had been transferred is "a factual determination." See id. at 1082. It made clear that "the certificate of title constitutes no more than some evidence of ownership." See id. We predict that the Pennsylvania Supreme Court would adopt the reasoning in Walker. See Wolfe v. Allstate Prop. & Cas. Ins. Co., 790 F.3d 487, 492 (3d Cir. 2015).

All of the surrounding circumstances must be considered in determining whether Vederman became the owner of the Porsche simply by the signing of the transfer of title to him by Chenaut–Fattah. The jury had before it overwhelming evidence to find that Chenault–Fattah maintained ownership of the Porsche and that the sale to Vederman was a sham.

■ Alternatively, the defendants argue that even if there was sufficient evidence to support convictions for bribery and bribery conspiracy, they are entitled to a new trial because the court's jury instructions were erroneous in light of the subsequently announced McDonnell decision. They assert that because they objected to the jury instructions on the meaning of official act, they are entitled to harmless error review. Under the harmless error standard of review, a new trial is warranted unless "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" See Neder, 527 U.S. at 15, 119 S.Ct. 1827, (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); McDonnell, 136 S.Ct. at 2375; Fed. R. Crim. P. 52(a).

The Government does not dispute and this court acknowledges that under McDonnell our instructions to the jury on the meaning of official act turned out to be incomplete and thus erroneous with re-

spect to Counts Sixteen, Seventeen, and Eighteen. The Government also concedes that the defendants objected to the relevant portions of the jury instructions. Yet, the Government urges that plain error review, not harmless error review, is appropriate because the defendants did not suggest the exact language subsequently announced by the Supreme Court in McDonnell. We disagree. Since the defendants objected to the charge on the meaning of official act, the precise language of the federal bribery statute that was at issue in McDonnell, harmless error review is appropriate. See McDonnell, 136 S.Ct. at 2375 (citing Neder, 527 U.S. at 16, 119 S.Ct. 1827); United States v. Wright, 665 F.3d 560, 570–71 (3d Cir. 2012). Although the defendants' proposed jury instruction did not predict what the Supreme Court subsequently announced in McDonnell, harmless error review does not require such clairvoyance. See Wright, 665 F.3d at 571.

In Wright, our Court of Appeals addressed an error in the jury instructions in light of a change in the honest services fraud law announced by the Supreme Court in Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). The District Court in Wright had charged the jury that it could convict the defendants for honest services fraud based on either a "conflict-of-interest" theory or a "bribery" theory. See Wright, 665 F.3d at 567. In Skilling, the Supreme Court held that the "conflict-of-interest" theory was an impermissible basis for conviction. On appeal, the defendants in Wright argued that there was insufficient evidence to uphold their convictions on the bribery theo-

ry and that the erroneous jury instruction was not harmless error.

Our Court of Appeals vacated the defendants' honest services fraud convictions and remanded for a new trial because "the evidence supporting the bribery theory, while sufficient, [was] less than the 'overwhelming' evidence needed to hold that an error is 'harmless beyond a reasonable doubt.'" See Wright, 665 F.3d at 571 (quoting United States v. Balter, 91 F.3d 427, 440 (3d Cir. 1996)). The Court reasoned that a new trial was necessary because there were "plausible alternate inferences about [the defendants'] intent" such that a reasonable juror could have found for the defendant and because it could not "say that the erroneous instruction did not contribute to the verdict."[15] See id., at 572. In contrast to Wright, the evidence here, as noted above, of the official acts exchanged for things of value was overwhelming.

The evidence of official acts in this case was far more compelling than in McDonnell. The testimony there described how Governor McDonnell set up meetings, contacted officials, and hosted events concerning Anatabloc, the nutritional supplement that Williams was seeking to develop and market. Significantly, the Supreme Court stressed that there was evidence that the Governor's alleged official acts were not specific and focused exercises of governmental power but dealt with Virginia business and economic development. The Court cited evidence that the Governor did not ask or expect any action to be taken by state officials. The Court also referenced evidence that he did not accede to Williams' request for funding for Virginia's

---

**15.** The defendants now argue that a new trial is warranted because, as in Wright, a jury could plausibly infer that their friendship was the motive of Vederman's generosity and Fattah's efforts on his behalf. That theory was argued to and rejected by the jury. It has nothing to do with the change in the law by McDonnell, which affected only the official act prong of § 201.

universities to conduct research on Anatabloc, and it was never covered under Virginia's health plan for state employees. The Supreme Court was concerned that the jury may have convicted merely based on the Governor's expression of support for certain matters. Those concerns do not exist here.

In sum, Fattah's acts related to his pursuit of an ambassadorship for Vederman and his hiring of Vederman's girlfriend without any doubt met all the requirements of McDonnell for official acts. Unlike McDonnell, a rational jury could not have otherwise viewed the evidence. The official acts of Fattah were specific and focused exercises of governmental power to obtain an ambassadorship for Vederman by at the very least advising the President and Senator Casey with the intent that his advice would form the basis for Vederman's appointment. There was no way that a jury could have rationally considered Fattah's acts as mere expressions of support without more. His conduct on behalf of Vederman was unrelenting. Fattah likewise engaged in a specific and focused exercise of governmental power while he hired Vederman's girlfriend. The Government without question established a quid pro quo, that is, the stream of benefits provided by Vederman in exchange for the official acts. When Fattah undertook these official acts there was a benefit emanating from Vederman. The Government has met its heavy burden to prove beyond a reasonable doubt that the incomplete and thus erroneous jury instruction on the meaning of official acts did not influence the verdict on the bribery counts. See Neder, 527 U.S. at 15, 119 S.Ct. 1827; McDonnell, 136 S.Ct. at 2375; Fed. R. Crim. P. 52(a).

There is no danger that a miscarriage of justice has occurred. See United States v. Silveus, 542 F.3d 993, 1004–05 (3d Cir. 2008). Under Rule 33, the interest of justice does not require a new trial. Consequently, we will deny the motions of Fattah and Vederman for judgments of acquittal or for a new trial on Counts Sixteen, Seventeen, and Eighteen and will deny the motion of Bowser for judgments of acquittal or new trial on Count Sixteen.

## XI.

Fattah, Vederman, and Bowser argue that they are entitled to judgments of acquittal or alternatively a new trial with respect to Counts Nineteen and Twenty because the Government failed to prove that the Credit Union Mortgage Association ("CUMA"), the victim named in those counts, was a "financial institution."

On Count Nineteen, the defendants were convicted of bank fraud in violation of 18 U.S.C. §§ 1344 and 2. Specifically, the indictment alleged that they "aided and abetted by one another and others, knowingly executed, and attempted to execute, a scheme to defraud CUMA, a federally insured financial institution, and to obtain monies owned by and under the care, custody, and control of that financial institution by means of false and fraudulent pretenses, representations, and promises." (Emphasis added).

Section 1344 provides that a defendant commits bank fraud where he or she:

knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

See 18 U.S.C. § 1344 (emphasis added).

In Count Twenty, Fattah, Vederman, and Bowser were found guilty of making

false statements to a financial institution in violation of 18 U.S.C. §§ 1014 and 2. The indictment charged that the defendants "aided and abetted by one another and others, knowingly made and caused to be made to CUMA false statements for the purpose of influencing the actions of CUMA, a federally insured financial institution, upon a $320,000 mortgage for defendant FATTAH and ... [his wife] as part of the purchase of a Poconos vacation home." (Emphasis added).

Section 1014 reads in relevant part:

Whoever knowingly makes any false statement or report ... [to a financial institution] upon any application ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years or both.

See 18 U.S.C. § 1014.

The parties agree that the relevant definition of a "financial institution" under §§ 1344 and 1014 is:

(2) a credit union with accounts insured by the National Credit Union Share Insurance Fund; [or] ...

(10) a mortgage lending business (as defined in section 27 of this title).

See 18 U.S.C. § 20.

At trial, the Government proved that Fattah and his wife had completed an application for a mortgage for the Pocono vacation house with the Wright Patman Federal Credit Union. That application was subsequently sent to CUMA for processing. In response to CUMA's inquiry, Fattah told it that the $18,000 that Vederman had wired to him in January 2012 represented the money obtained from the sale of Chenault–Fattah's Porsche even though no bona fide sale had taken place.

Eddie Scott Toler, the president and chief executive officer of CUMA, testified that CUMA is a for-profit corporation organized under the laws of Delaware and is a credit union service organization owned by forty-eight non-profit credit unions. The credit unions that own CUMA are each federally insured by the National Credit Union Share Insurance Fund. According to Toler, CUMA is not a federally insured institution.

CUMA is organized to serve credit unions and their members. Its services consist "exclusively" of "provid[ing] first trust residential mortgage loaning services, all the way from the origination of the mortgage loan through processing, underwriting, closing, and access to the secondary market where—and we're selling the mortgage loan on the secondary market." This includes "processing and evaluating mortgage applications" as well as "closing on the mortgage" and "handling the sale and the secondary mortgage market." CUMA provides these services to approximately sixty-five credit unions, including its forty-eight owners.

CUMA is licensed to do business in the District of Columbia, Maryland, and Virginia and can therefore close on mortgages in its own name in those jurisdictions. Because CUMA does not actually have any money to fund these mortgage loans, it drafts from the accounts of the credit union on whose behalf it is acting to fund the closing. CUMA then sells the mortgage to an investor on the secondary market or returns it to credit union client which has advanced funds to pay the seller. While technically CUMA holds mortgages for a limited period of time, it does not hold mortgages long-term.

The Fattahs' closing took place in Pennsylvania where CUMA is not licensed. In this state, CUMA conducts the closing in the name of its credit union client, which is exempt from licensing requirements. Thus, the credit union, not CUMA, owned the Fattah loan during the time period between the closing and any sale to the

investor. CUMA is otherwise involved in all other aspects of the mortgage application to the same extent it is in the District of Columbia, Maryland, and Virginia.

We instructed the jury in relevant part in connection with both Counts Nineteen and Twenty:

> The second element of bank fraud is that the entity being defrauded must be a financial institution. For purposes of this case, this means the government must prove that the entity, in this case CUMA, was either: (a) a credit union with accounts insured by the National Credit Union Share Insurance Fund; or (b) a mortgage lending business, that is an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations and the activities of which affect interstate commerce.

The defendants did not object to this jury instruction.

 For CUMA to be a financial institution under §§ 1344 and 1014, it must be federally insured or a mortgage lending business. There was no evidence that CUMA itself is federally insured. It is merely a loan processing corporation which in this case acted on behalf of a federally insured institution, the Wright Patman Credit Union. The latter provided the funds for the Fattahs' mortgage for the Pocono vacation home.

The Government responds that CUMA can be deemed a federally insured institution because it is owned by forty-eight federally insured credit unions. We do not see how CUMA, a Delaware corporation, which is not a federally insured financial institution, suddenly metamorphosed into one because it happens to be owned by a number of federally insured financial institutions. See United States v. Bouchard, 828 F.3d 116, 126–27 (2d Cir. 2016). The

Government introduced no evidence to pierce the corporate veil between CUMA and the Wright Patman Credit Union or the other credit unions which own it. To the extent that cases from the Court of Appeals for the First Circuit are to the contrary, we do not find them persuasive. See United States v. Edelkind, 467 F.3d 791, 801 (1st Cir. 2006); United States v. Walsh, 75 F.3d 1, 8–9 (1st Cir. 1996).

If any federally insured financial institution was the victim under §§ 1344 and 1014, it was the Wright Patman Credit Union. However, the Government never identified it in the indictment and, thus, never gave the defendants proper notice to defend against Counts Nineteen and Twenty.

It is the Government's fallback position that if CUMA is not federally insured, it is a mortgage lending business which meets the definition of a financial institution under §§ 1344 and 1014. A mortgage lending business for present purposes is defined as follows:

> the term "mortgage lending business" means an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations, and whose activities affect interstate or foreign commerce.

See 18 U.S.C. § 27 (emphasis added).

The record is devoid of any evidence that CUMA finances or refinances any debt. It did not finance or refinance the debt of Fattah and his wife in connection with their vacation home purchase. It was the Wright Patman Credit Union which did so. Nor, as far as the record reveals, does CUMA do so for any other buyer of real estate. CUMA simply is a loan processor for various credit unions which do the financing or refinancing.

The Government focuses on the fact that CUMA may hold mortgages for a short period of time while it is selling them in the secondary market. This activity does not constitute the financing or refinancing of debt. CUMA is not the mortgagee. It is merely selling the debt instrument to a third party. This transaction has no effect whatsoever on the mortgagor. He or she is still subject to the same pre-existing debt at the same pre-existing interest rate.[16]

The Government has not established what it alleged in the indictment, that is that CUMA is a federally insured financial institution. Nor has it shown in the alternative that CUMA is a mortgage lending business. Furthermore, the language of §§ 1344 and 1014 cannot be stretched to encompass CUMA. The Supreme Court has cautioned courts to apply "the canon of strict construction of criminal statutes, or rule of lenity, [which] ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." See United States v. Lanier, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Any fraud against or a false statement to CUMA is not clearly covered by §§ 1344 and 1014.

The Government has not proven one of the elements of the offenses necessary to convict under §§ 1344 and 1014. Thus the court will grant the motions of Fattah, Vederman, and Bowser for judgments of acquittal on Counts Nineteen and Twenty.[17]

## XII.

Fattah, Vederman, and Bowser were charged in Count Twenty–One with falsification of records in violation of 18 U.S.C. §§ 1519 and 2. They were found guilty and now seek acquittals because of insufficient evidence or in the alternative a new trial. Section 1519, as previously noted, provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

See 18 U.S.C. § 1519.

The indictment averred that these defendants:

> aided and abetted by one another and others, knowingly concealed, covered up, falsified and made false entries in documents, specifically, a "MOTOR VEHICLE BILL OF SALE" with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Justice

---

**16.** We note that Toler testified that the "mortgages either get sold back to the partner credit unions or get sold directly on the secondary market." (Emphasis added). But Toler also testified that the credit union, not CUMA, pays the seller at closing. In light of this, it does not appear that CUMA actually "sells" mortgages to the credit union given that it is the credit union that funded the mortgages in the first place.

**17.** Pursuant to Rule 29(d) of the Federal Rules of Criminal Procedure, we find no new trial is warranted on Counts Nineteen and Twenty to the extent that the Court of Appeals disagrees with our decision to grant judgments of acquittal.

("DOJ") and the Federal Bureau of Investigation ("FBI").

 Under § 1519, the Government must first prove that the document in issue was false or contained false entries. It must also demonstrate that: (1) the defendant intended to impede an investigation into any matter and or in relation to or in contemplation of any matter; and (2) the matter at issue was within the federal government's jurisdiction. See United States v. Moyer, 674 F.3d 192, 210 (3d Cir. 2012). While the Government must establish that the defendant intended to impede an investigation, it does not have to establish that the defendant intended to obstruct a federal investigation. It is sufficient for the Government to prove simply that the matter which is the subject of an investigation was within the jurisdiction of a department or agency of the United States, regardless of the defendant's knowledge or intent in this regard. See id.

 The Government presented evidence that the motor vehicle bill of sale for Chenault–Fattah's Porsche was signed by Vederman on January 17 or 18, 2012 and signed by Renee Chenault–Fattah on January 18. Bowser signed as a witness on January 18. Fattah emailed the signed motor vehicle bill of sale to CUMA on January 19. Sometime on January 18 or 19, the document was backdated with the date of January 16. The Government presented evidence that the bill of sale was a sham. The Government demonstrated that Vederman never took possession or delivery of the vehicle and that Chenault–Fattah engaged in a number of acts and made statements signifying that she still owned it.

The defendants argue that even if the bill of sale was false the Government did not prove that defendants intended to impede an investigation or in relation to or in contemplation of an investigation into any matter. The Government simply counters by relying on Moyer and United States v. Gray, 642 F.3d 371 (2d Cir. 2011). These cases are not helpful to the Government because unlike in this action the Government established in each that there was an impending investigation which happened to be within the jurisdiction of a federal agency.

In Moyer, a police chief was indicted and convicted under § 1519 for falsifying a police report about a racial incident which resulted in the death of a Latino man. The police chief prepared his false report knowing that the investigation by the district attorney was under way. The Court of Appeals, in sustaining the conviction, held that the jury had ample evidence to find that the report was false and that the defendant had prepared a false report after the district attorney, as part of his investigation of a police cover-up, had directed the police chief to prepare a report of the police investigation. See Moyer, 674 F.3d at 208. It was irrelevant that the police chief did not know of any federal investigation. The Government, as required, proved that the Federal Bureau of Investigation had jurisdiction over racially motivated killings.

In Gray, a guard at a privately owned prison who beat up a federal prisoner was indicted under § 1519 for falsifying a report of the incident. He prepared his report on that incident only after being directed to do so by an administrative lieutenant at the correctional facility. The guard obviously wrote the report to impede an investigation. See Gray, 642 F.3d at 379. Again, the federal government had jurisdiction over the matter.

We acknowledge that § 1519 does not require the existence of an investigation at the time that the document is falsified. Nonetheless, the statute demands that the Government prove that a defendant acted

to impede an investigation or did so in relation to or in contemplation of an investigation. In contrast to the circumstances in <u>Moyer</u> and <u>Gray</u>, the Government presented no evidence from which the jury could infer that Fattah, Vederman, or Bowser knew of or even contemplated any investigation whatsoever, be it federal or otherwise. At most, the Government has simply demonstrated that defendants were involved in presenting a false document to CUMA, a private entity.

The Government did not argue to the contrary in its closing to the jury. The part of its summation related to the false bill of sale never referenced any intent by defendants to prepare or use the false bill of sale in contemplation of any investigation. Indeed, the focus was only on the preparation and use of that false document to deceive CUMA in connection with the purchase of the Fattahs' vacation home. Counsel for the Government simply stated in his closing:

> [W]hen Vederman wrote back "Love to purchase the car," nobody even bothered with a bill of sale ... They don't even start with the documentation until after the financial institution asks for it ...[T]hey ginned up these documents only after CUMA asked for them. <u>They don't want the bank to know that this is a fake car sale.</u>

(Emphasis added). The motions of defendants Fattah, Vederman, and Bowser for judgments of acquittal on Count Twenty–One will be granted.[18]

## XIII.

Count Twenty–Two charged Fattah, Vederman, and Bowser with money laundering with regard to the $25,000 transfer of funds from Fattah's Wright Patman Credit Union account to an escrow account for the purchase of the Pocono home, in violation of 18 U.S.C. §§ 1957 and 2. According to the Government, that $25,000 transfer included the $18,000 bribe paid by Vederman to Fattah in exchange for the official act of hiring Vederman's girlfriend. The Government showed that the credit union account of Fattah did not have sufficient funds for the transfer of the $25,000 without the $18,000 derived from the unlawful criminal activity. All three were found guilty on Count Twenty–Two.

Count Twenty–Three charged Fattah, Vederman, and Bowser with money laundering conspiracy in violation of 18 U.S.C. § 1956(h). As in Count Twenty–Two, it concerned the alleged $18,000 bribe paid by Vederman to Fattah in exchange for the official act of hiring Vederman's girlfriend. The jury returned a verdict of guilty against Fattah and Vederman but not guilty as to Bowser.

The defendants first assert that judgments of acquittal or a new trial are necessary on the ground that their convictions on Counts Sixteen, Seventeen, and Eighteen, the bribery related charges, must be reversed. We agree that these three counts are closely related to Counts Twenty–Two and Twenty–Three. However, because the court has sustained the verdicts on these bribery charges against Fattah, Vederman, and Bowser, this argument fails.

The defendants also argue that the verdicts were against the weight of the evidence. This position too is without merit. To the extent the defendants are claiming prejudicial spillover of evidence, we find this argument likewise lacks merit as set

---

**18.** Pursuant to Rule 29(d) of the Federal Rules of Criminal Procedure, we find no new trial is warranted on Count Twenty–One to the extent that the Court of Appeals disagrees with our decision to grant judgments of acquittal.

forth in greater detail in Section XVI of this Memorandum.

Accordingly, the motion of Fattah and Vederman for judgment of acquittal or a new trial on Counts Twenty–Two and Twenty–Three will be denied and the motion of Bowser for a judgment of acquittal or a new trial on Count Twenty–Two will be denied.

## XIV.

Nicholas, the chief executive officer of EAA, was found guilty on Counts Twenty–Five and Twenty–Six of wire fraud in violation of 18 U.S.C. § 1343 in connection with two false emails she sent to NOAA in July and August 2012. These emails concerned a grant that EAA was seeking from NOAA for a conference on higher education sponsored by EAA.

In Counts Twenty–Eight and Twenty–Nine, the jury convicted her of falsification of records to impede a federal investigation in violation of 18 U.S.C. § 1519. Count Twenty–Eight referenced a November 2013 financial report transmitted by Nicholas to NOAA which falsely certified that a $50,000 grant from NOAA to EAA was used for a conference on higher education in October 2012, even though the conference was never held. Count Twenty–Nine accused her of submitting a final performance progress report to NOAA that falsely described the non-existent October 2012 National Conference on Higher Education and falsely stated that Congressman Chaka Fattah was the featured speaker.

Nicholas does not challenge the sufficiency of the evidence against her on these four counts. Instead, she seeks a by new trial because of the alleged prejudicial spillover effect caused by the bribery and bribery-related evidence introduced against defendants Fattah, Vederman, and Bowser. Nicholas was not charged with such offenses. The spillover argument is without merit for the reasons stated in Section XVI of this Memorandum.

The motion of Nicholas for a new trial on Counts Twenty–Five, Twenty–Six, Twenty–Eight, and Twenty–Nine will be denied.

## XV.

Fattah, Vederman, Brand, and Nicholas seek judgments of acquittal or a new trial on Count One, which charged them with participating in a conspiracy to commit racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d).[19] The defendants assert that there was insufficient evidence to support a rational jury's determination that they had agreed to participate in the affairs of a RICO enterprise.

In answer to special interrogatories with respect to RICO conspiracy in Count One, the jury found that Fattah agreed that a conspirator would commit the following types of racketeering activity: mail fraud, wire fraud, bank fraud, bribery, obstruction of justice, and money laundering. The jury determined that Vederman had agreed that a conspirator would commit racketeering activities consisting of wire fraud, bank fraud, bribery, and money laundering. As for Brand and Nicholas, the jury found that each had agreed that a conspirator would commit wire fraud and obstruction of justice as racketeering activities.

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." See § 1962(d). As relevant here, § 1962(c) provides that "[i]t shall be unlawful for any person employed by or

---

19. Bowser was acquitted on Count One.

associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." See § 1962(c).

■ Our Court of Appeals has explained:

[t]o establish a § 1962(c) RICO violation, the government must prove the following four elements: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated ..., either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."

United States v. Bergrin, 650 F.3d 257, 265 (3d Cir. 2011) (quoting United States v. Irizarry, 341 F.3d 273, 285 (3d Cir. 2003)). To prove a RICO conspiracy, the Government must show that the defendant knowingly agreed to participate in the enterprise's affairs through a pattern of racketeering activity. See United States v. Console, 13 F.3d 641, 653 (3d. Cir. 1993); United States v. Riccobene, 709 F.2d 214, 220–21 (3d Cir. 1983), abrogated on other grounds by Bergrin, 650 F.3d at 266 n.5.

Under the RICO statute, an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." See § 1961(4). The Supreme Court has explained that this definition is "obviously broad" because "[t]he term 'any' ensures that the definition has a wide reach ... and the very concept of an association in fact is expansive." See Boyle v. United States, 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). The Government described the enterprise in this case as an association-in-fact.

■ An association-in-fact RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." See United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946, 129 S.Ct. 2237. Its existence is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit .... separate and apart from the pattern of activity in which it engages." See Turkette, 452 U.S. at 583, 101 S.Ct. 2524.

■ A RICO conspiracy must also involve an agreement to commit a "pattern of racketeering activity" which "requires at least two acts of racketeering activity." See § 1961(5). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.' " Boyle, 556 U.S. at 947, 129 S.Ct. 2237 (quoting Turkette, 452 U.S. at 583, 101 S.Ct. 2524). For example, if "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates[,] ... [p]roof of these patterns would not be enough to show that the individuals were members of an enterprise." See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 367 (3d Cir. 2010) (quoting Boyle, 556 U.S. at 947 n.4, 129 S.Ct. 2237). However, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.' " See Boyle, 556 U.S. at 947, 129 S.Ct. 2237 (quoting Turkette, 452

U.S. at 583, 101 S.Ct. 2524). "The existence vel non of a RICO enterprise is a question of fact for the jury." Console, 13 F.3d at 650. The indictment alleged that defendants Fattah, Vederman, Brand, Nicholas, and Bowser [20] participated in one or more of the five criminal schemes along with Lindenfeld and Naylor as part of a RICO conspiracy to "[f]urther[ ] and support[ ] the political and financial interests of FATTAH and his coconspirators through fraudulent and corrupt means" and "[p]romot[e] FATTAH's political and financial goals through deception by concealing and protecting the activities of the Enterprise." Fattah, Brand, and Nicholas now claim that the evidence was insufficient to prove that they conspired to participate in a RICO enterprise because the underlying schemes were distinct and not part of a single "continuing unit."

▮ As stated in Boyle, a RICO enterprise must have at least three structural features: (1) a common purpose; (2) relationships among associates; and (3) sufficient longevity to pursue the purpose. See Boyle, 556 U.S. at 946, 129 S.Ct. 2237. We start with the relationships among the enterprise associates. The relationships between Fattah and each of the other individuals were certainly longstanding. Fattah had represented the Second Congressional District of Pennsylvania in the United States House of Representatives since 1995 and had served in the Pennsylvania General Assembly before that time. He knew all the codefendants for years in politics. Brand was a long-time Fattah supporter, and Brand's wife had previously been employed by Fattah on his congressional staff. Nich-

olas was also a former employee on Fattah's congressional staff and was the chief executive officer of EAA, a non-profit established by Fattah. Naylor and Fattah had known each other for over thirty years. Naylor worked for Fattah while Fattah was a Pennsylvania State Senator and later on his congressional staff. Lindenfeld had known and worked with Fattah since 1999 on his campaigns.

In addition, Brand, Nicholas, Lindenfeld, and Naylor all had long-standing relationships with one another. Nicholas and Naylor had known each other for approximately twenty years and had worked together on Fattah's congressional staff. Naylor also knew Brand as a result of Brand's business SFP. Brand and Nicholas also had a long-term business relationship through SFP and EAA. Lindenfeld and Naylor had both participated in Fattah's mayoral campaign in 2007 and were friends. Similarly, Lindenfeld and Brand knew one another through Fattah. At trial, the Government proved that Fattah, Brand, Nicholas, Naylor, and Lindenfeld had longstanding relationships and associations with one another.[21]

For a RICO conspiracy to exist, the conspirators must agree to participate in an enterprise with a unity of purpose as well as relationships among those involved. The evidence demonstrates that an agreement among Fattah, Brand, Nicholas, Lindenfeld, and Naylor existed for the overall purpose of maintaining and enhancing Fattah as a political figure and of preventing his standing from being weakened by the failure to be able to pay or write down his campaign debts. These five persons agreed

---

20. The jury acquitted Bowser of conspiracy to commit racketeering.

21. Again, although the Government alleged that Bowser was involved in the RICO con-

spiracy, she was acquitted on Count One. We will discuss the evidence relating to Vederman's involvement in the RICO conspiracy below.

to work together as a continuing unit, albeit with different roles.

The Government established that Fattah, Brand, and Nicholas conspired along with Naylor and Lindenfeld to conceal and repay the 2007 illegal $1,000,000 loan to the Fattah for Mayor campaign. Pursuant to Fattah's efforts, Lindenfeld received the $1,000,000 loan from the donor and at Fattah's instruction Lindenfeld signed a promissory note to conceal the loan. Lindenfeld forwarded a portion of the illegal loan to Naylor who then used it to pay Fattah's campaign expenses, including $200,000 for election day "walking around money." Although Lindenfeld was able to return $400,000 in unused funds to the donor, Fattah needed to find $600,000 to repay the remainder of the loan. Lindenfeld, as signer of the promissory note for the loan, pressed Fattah to have it repaid. Fattah told Lindenfeld that he would make sure that the donor was made whole.

In order to do so, Fattah directed Nicholas, the chief executive officer of EAA, to provide the funds to pay back the illegal loan. EAA had received that money as Sallie Mae and NASA grants to perform charitable work. Nicholas transferred $500,000 to Brand and his company SFP in January 2008, and, that same month, Brand wired $600,000 to Lindenfeld's firm, LSG. Lindenfeld then wired the $600,000 to the original donor. To compensate Brand for the additional $100,000 that he had contributed, Nicholas later provided him with $100,000 from a NASA grant that had been intended for use by EAA. Lindenfeld in turn kept Fattah apprised of what was happening, and Fattah told Naylor about his efforts to obtain the funds to repay the loan.

As part of the RICO conspiracy, Fattah directed Naylor to submit a bogus invoice for $193,000 from his firm, SLA, to the Fattah for Mayor campaign to conceal portions of the illegal campaign loan. Nicholas and Brand engaged in obstruction of justice in concealing the illegal campaign loan by belatedly executing a sham contract between their companies, SFP and EAA, months after the $600,000 had been transferred to SFP and only after a Department of Justice audit of EAA had begun and a subpoena from the Office of Inspector General of the Department of Justice had been served on SFP. Lindenfeld and Brand also entered into a sham contract to conceal the movement of money. Fattah thereafter obstructed justice by annually writing down in $20,000 increments the bogus debt to Naylor's firm in the public Fattah for Mayor campaign filings into 2014. While each member may not have been involved in every aspect of the enterprise, its activities were sufficiently structured and coordinated to achieve the purpose of maintaining and enhancing Fattah's political standing and of preventing him from being weakened politically because of his campaign debts.

A RICO conspiracy also requires an agreement to participate in an enterprise with longevity sufficient to pursue its purpose. This was established. In May 2007 the illegal loan was obtained and continued through its repayment in January 2008 and into at least 2014 when the last campaign report reducing a fake campaign debt to Naylor's consulting firm was filed by Fattah.

There was more than sufficient evidence with respect to the illegal loan scheme for the jury to find that Fattah, Brand, and Nicholas knowingly and intentionally conspired to be a part of an association-in-fact enterprise with Lindenfeld and Naylor through a pattern of at least two racketeering activities involving wire fraud and obstruction of justice. See 18 U.S.C. §§ 1343, 1346, and 1512. Consequently, as to these defendants, we need not decide

whether there was an agreement with respect to the other proven criminal schemes such as to constitute a part of the RICO conspiracy.

The motions of Fattah, Brand, and Nicholas for judgments of acquittal on Count One will be denied.

■ The Government also alleged that Vederman participated in the RICO conspiracy in Count One. The Government claims that Vederman agreed to participate in the affairs of the enterprise by participating in a bribery scheme between 2008 and 2012. As discussed in detail in Section X of this Memorandum, the Government proved that Vederman was guilty of bribery and bribery conspiracy by providing things of value to Fattah in exchange for Fattah's official acts in support of Vederman's quest for an ambassadorship and in hiring of Vederman's girlfriend to his staff. Nonetheless, there is insufficient evidence that Vederman was part of any RICO enterprise

The purpose of the bribery scheme was quite different from the purpose of the RICO enterprise described above. The objective of the latter was to maintain and enhance Fattah's standing as a political figure and to prevent it from being weakened by his failure to be able to pay or write down his campaign debts. With the bribery scheme the objective was simply personal financial benefits for Fattah in return for personal favors in the form of official acts for Vederman. Despite his congressional salary and his wife's generous income, Fattah was not always able to make ends meet. Vederman filled the breach. He provided guarantees and money for Fattah's au pair, paid his Philadelphia wage taxes, gave money to his son, and wired the $18,000 so that Fattah and his wife could buy a vacation home. In exchange, Fattah sought to obtain an ambassadorship for Vederman and gave Ved-

erman's girlfriend a bogus job on his congressional staff. These were exchanges of personal quid pro quo things of value that had nothing to do with Fattah's campaigns for office or his stature as a political figure.

Furthermore, the relationship component of a RICO enterprise was missing. Nothing tied the bribery scheme to Brand, Nicholas, Lindenfeld or Naylor. See In re Ins. Brokerage Antitrust Litig., 618 F.3d at 374. The record contains no evidence that Vederman agreed to play a role or even knew about the events surrounding the illegal $1,000,000 loan or any other criminal scheme in which other defendants were involved except for the bribery scheme.

The bribery scheme is precisely the type of bare hub-and-spoke relationship which our Court of Appeals has instructed is insufficient to connect a defendant to a RICO enterprise. See id. This scheme involved only Fattah, Vederman, and Bowser. Of those participants, only Fattah, the so-called hub of the enterprise, agreed to participate in the RICO enterprise involving the $1,000,000 loan. Bowser of course was acquitted on Count One charging RICO conspiracy and on Count Two charging conspiracy concerning the illegal loan. Vederman was not even named in Count Two.

Because there is no "unifying rim" connecting Vederman to the RICO conspiracy, the Government "fail[s] the basic requirement that the components function as a unit, that they be 'put together to form a whole.'" See id.; see also Turkette, 452 U.S. at 583, 101 S.Ct. 2524. Absent any evidence connecting Vederman to the RICO conspiracy, a jury could not reasonably find that he agreed to participate in the affairs of the association-in-fact enter-

prise with Fattah, Brand, Nicholas, Lindenfeld and Naylor.

The Government has not met its burden to prove that Vederman conspired to be a part of the RICO enterprise, and we will grant his motion for judgment of acquittal as to Count One.[22]

## XVI.

Finally, Fattah, Vederman, Brand, Nicholas, and Bowser all raise an additional argument that they are entitled to a new trial on the counts where the court has not otherwise overturned the jury verdict. They maintain that they have suffered unfair prejudice due to the spillover effect of evidence introduced on the reversed counts.

Specifically, Fattah seeks a new trial on this ground on: Count One (conspiracy to commit racketeering); Count Two (conspiracy to commit wire fraud); Count Three (conspiracy to commit honest services wire fraud); Count Four (conspiracy to commit mail fraud); Counts Five through Seven, Nine and Ten (mail fraud); Counts Eleven through Fifteen (falsification of records); Count Sixteen (bribery conspiracy); Count Seventeen (bribery); Count Twenty–Two (money laundering); and Count Twenty–Three (money laundering conspiracy). These counts concerned all the criminal schemes described in the indictment except for the scheme involving Nicholas' fraud against and false statements to NOAA.

The convictions remaining as to Vederman are on Counts Sixteen (bribery conspiracy), Eighteen (bribery), Twenty–Two (money laundering), and Twenty–Three (money laundering conspiracy). These all are related to the bribery scheme.

Brand seeks a new trial on Count One (conspiracy to commit racketeering) and Count Two (conspiracy to commit wire fraud). The counts as to him involved the $1,000,000 illegal loan scheme.

Nicholas moves for a new trial on Count One (conspiracy to commit racketeering), Count Two (conspiracy to commit wire fraud), Counts Twenty–Five and Twenty–Six (wire fraud), and Counts Twenty–Eight and Twenty–Nine (falsification of records). Counts One and Two as related to her concerned the $1,000,000 illegal loan scheme while the remaining counts accused her of fraud against and false statements to NOAA concerning the $50,000 grant to EAA.

Bowser seeks a new trial on Counts Sixteen (bribery conspiracy) and Twenty–Two (falsification of records). These counts dealt with the bribery scheme.

As noted, we are granting judgments of acquittal in favor of Fattah on Count Eight and in favor of Fattah, Vederman, and Bowser on Counts Nineteen, Twenty, and Twenty–One. Count Eight charged Fattah with mail fraud in connection with the scheme to use campaign funds to pay the student debts of Chaka Fattah, Jr. The Government did not present evidence sufficient to prove that Bowser had mailed the check in issue to Naylor. Counts Nineteen and Twenty charged Fattah, Vederman, and Bowser with bank fraud and false statements to financial institutions, respectively, in connection with the financing and purchase of Fattah's vacation home. The Government failed to meet its burden to establish that CUMA was a financial institution as defined under the relevant statue. Finally, Count Twenty–One charged Fattah, Vederman, and Bowser with falsi-

---

**22.** Pursuant to Rule 29(d) of the Federal Rules of Criminal Procedure, we find no new trial is warranted on Count One as to Veder- man to the extent that the Court of Appeals disagrees with our decision to grant the judg- ment of acquittal.

fication of records. Here, the Government did not introduce any evidence that the false bill of sale for the Porsche submitted to CUMA was created with the intent to impede an investigation.

The court is also granting a judgment of acquittal to Vederman on Count One. The Government did not establish that he was part of any RICO enterprise.

Thus, we must decide whether evidence introduced on the counts where the court is entering judgments of acquittal under Rule 29 had a prejudicial "spillover effect" on the counts that remain. Our Court of Appeals has instructed us to consider:

> (1) whether the jury heard evidence that would have been inadmissible at a trial limited to the remaining valid count (i.e., "spillover" evidence); and (2) if there was any spillover evidence, whether it was prejudicial (i.e., whether it affected adversely the verdict on the remaining count). Considered conversely, we have the shorthand label "prejudicial spill-over."

. . .

> When a defendant is convicted on two counts involving different offenses at a single trial and an appellate court reverses his conviction on one of them, prejudicial spillover can occur only if the evidence introduced to support the reversed count would have been inadmissible at a trial on the remaining count.

See United States v. Cross, 308 F.3d 308, 317 (3d Cir. 2002).

If the evidence on a reversed count was also admissible to prove one of the remaining counts, there is no prejudice and the inquiry ends. If the evidence would not have been admissible as to a remaining count, we must determine whether there is a high probability that it prejudiced the outcome. See id. at 318.

The evidence on the acquitted counts was relevant to some of the remaining counts and was not relevant or admissible as to other counts. This is not uncommon in multi-count criminal cases of this complexity.

 The court, to avoid any spillover issue, charged the jury that it must consider and weigh separately the evidence against each defendant on each count and not be swayed by the evidence introduced against other defendants on the same or different counts. The court did so both in its preliminary instructions at the beginning of the trial and again in its final instructions before the jury retired to deliberate. It is well established that the jury is presumed to follow the court's instructions. See Zafiro v. United States, 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). That the jury did so is supported by the fact that it returned seventeen not guilty verdicts—one as to Nicholas and sixteen as to Bowser. We observed the jury in the courtroom and heard the evidence. The evidence against the defendants on the counts where the court has upheld the guilty verdicts was overwhelming. In our view, it is highly probable that the jury was not influenced by any spillover testimony or exhibits. See id.

The following motions based on prejudicial spillover of evidence will be denied: the motion of Fattah for a new trial on Counts One through Seven, Nine through Seventeen, Twenty–Two and Twenty–Three; the motion of Vederman for a new trial on Counts Sixteen, Eighteen, Twenty–Two and Twenty–Three; the motion of Brand for a new trial on Counts One and Two; the motion of Nicholas for a new trial on Counts One, Two, Twenty–Five, Twenty–Six, Twenty–Eight and Twenty–Nine; and the motion of Bowser for a new trial on Counts Sixteen and Twenty–Two.

## ORDER

AND NOW, this 20th day of October, 2016, for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that:

(1) the motion of defendant Chaka Fattah, Sr. for judgments of acquittal or for a new trial on Counts One, Two, Three, Four, Five, Six, Seven, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Twenty–Two and Twenty–Three of the Indictment is DENIED;

(2) the motion of defendant Chaka Fattah, Sr. for judgments of acquittal on Counts Eight, Nineteen, Twenty, and Twenty–One of the Indictment is GRANTED;

(3) the motion of defendant Herbert Vederman for judgments of acquittal or for a new trial on Counts Sixteen, Eighteen, Twenty–Two, and Twenty–Three of the Indictment is DENIED;

(4) the motion of defendant Herbert Vederman for judgments of acquittal on Counts One, Nineteen, Twenty, and Twenty–One of the Indictment is GRANTED;

(5) the motion of defendant Robert Brand for judgments of acquittal or a new trial on Counts One and Two of the Indictment is DENIED;

(6) the motion of defendant Karen Nicholas for judgments of acquittal or for a new trial on Counts One and Two of the Indictment is DENIED;

(7) the motion of defendant Karen Nicholas for a new trial on Counts Twenty–Five, Twenty–Six, Twenty–Eight, and Twenty–Nine of the Indictment is DENIED;

(8) the motion of defendant Bonnie Bowser for judgments of acquittal or for a new trial on Counts Sixteen and Twenty–Two of the Indictment is DENIED;

(9) the motion of defendant Bonnie Bowser for judgments of acquittal on Counts Nineteen, Twenty, and Twenty–One of the Indictment is GRANTED.